# BRANTI *v.* FINKEL ET AL.

No. 78–1654.  Argued December 4, 1979—Decided March 31, 1980

STEVENS, J., delivered the opinion for the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined. STEWART, J., filed a dissenting opinion, *post*, p. 520. POWELL, J., filed a dissenting opinion, in which REHNQUIST, J., joined and in Part I of which STEWART, J., joined, *post*, p. 521.

*Marc L. Parris* argued the cause for petitioner. With him on the briefs was *Charles Apotheker*.

*David MacRae Wagner* argued the cause and filed a brief for respondents.

MR. JUSTICE STEVENS delivered the opinion of the Court.

The question presented is whether the First and Fourteenth Amendments to the Constitution protect an assistant public defender who is satisfactorily performing his job from discharge solely because of his political beliefs.

Respondents, Aaron Finkel and Alan Tabakman, commenced this action in the United States District Court for the Southern District of New York in order to preserve their positions as assistant public defenders in Rockland County, New York.[1] On January 4, 1978, on the basis of a showing that the petitioner public defender was about to discharge them solely because they were Republicans, the District Court entered a temporary restraining order preserving the status quo. After hearing evidence for eight days, the District Court entered detailed findings of fact and permanently enjoined[2] petitioner from terminating or attempting to terminate respondents' employment "upon the sole grounds of

---

[1] Jurisdiction was based on 42 U. S. C. § 1983 and 28 U. S. C. § 1343 (3).

[2] Pursuant to Rule 65 (a) (2) of the Federal Rules of Civil Procedure, the plenary trial was consolidated with the hearing on the application for a preliminary injunction.

their political beliefs."[3] 457 F. Supp. 1284, 1285 (1978). The Court of Appeals affirmed in an unpublished memorandum opinion, judgment order reported at 598 F. 2d 609 (CA2 1979) (table).

The critical facts can be summarized briefly. The Rockland County Public Defender is appointed by the County Legislature for a term of six years. He in turn appoints nine assistants who serve at his pleasure. The two respondents have served as assistants since their respective appointments in March 1971 and September 1975; they are both Republicans.[4]

Petitioner Branti's predecessor, a Republican, was appointed in 1972 by a Republican-dominated County Legislature. By 1977, control of the legislature had shifted to the Democrats and petitioner, also a Democrat, was appointed to replace the incumbent when his term expired. As soon as petitioner was formally appointed on January 3, 1978, he began executing termination notices for six of the nine assistants then in office. Respondents were among those who were to be terminated. With one possible exception, the nine who were to be appointed

---

[3] The District Court explained that its ruling required petitioner to retain respondents in their prior positions, with full privileges as employees: "[C]ompliance with the judgment to be entered herein will require defendant both to permit plaintiffs to work as Assistants and to pay them the normal Assistant's salary. Mere payment of plaintiffs' salary will not constitute full compliance with the judgment entered herein; for plaintiffs' constitutional right, which is upheld herein, is the right not to be dismissed from public employment upon the sole ground of their political beliefs. Defendant cannot infringe that right of plaintiffs with impunity by the mere expedient of paying plaintiffs a sum of money." 457 F. Supp. 1284, 1285–1286, n. 4 (1978).

[4] The District Court noted that Finkel had changed his party registration from Republican to Democrat in 1977 in the apparent hope that such action would enhance his chances of being reappointed as an assistant when a new, Democratic public defender was appointed. The court concluded that, despite Finkel's formal change of party registration, the parties had regarded him as a Republican at all relevant times. *Id.*, at 1285, n. 2.

or retained were all Democrats and were all selected by Democratic legislators or Democratic town chairmen on a basis that had been determined by the Democratic caucus.[5]

The District Court found that Finkel and Tabakman had been selected for termination solely because they were Republicans and thus did not have the necessary Democratic sponsors:

> "The sole grounds for the attempted removal of plaintiffs were the facts that plaintiffs' political beliefs differed from those of the ruling Democratic majority in the County Legislature and that the Democratic majority had determined that Assistant Public Defender appointments were to be made on political bases." 457 F. Supp., at 1293.

The court rejected petitioner's belated attempt to justify the dismissals on nonpolitical grounds. Noting that both Branti and his predecessor had described respondents as "competent attorneys," the District Court expressly found that both had been "satisfactorily performing their duties as Assistant Public Defenders." *Id.*, at 1292.

Having concluded that respondents had been discharged solely because of their political beliefs, the District Court held that those discharges would be permissible under this Court's decision in *Elrod* v. *Burns,* 427 U. S. 347, only if

---

[5] "An examination of the selection process that was employed in arriving at the name of each of the nine 1978 appointees shows that the hiring decisions were, for all practical purposes, made by Democratic legislators or chairpersons in accordance with the procedures that had been decided upon by the Democratic caucus, and, with respect to every selection save that of Sanchez, those procedures excluded from consideration candidates who were affiliated with a party other than the Democratic Party. Moreover, the evidence shows that the only reason for which Branti sought to terminate plaintiffs as Assistants was that they were not recommended or sponsored pursuant to the procedures that had been decided upon by the Democratic caucus." *Id.*, at 1288.

assistant public defenders are the type of policymaking, confidential employees who may be discharged solely on the basis of their political affiliations. The court concluded that respondents clearly did not fall within that category. Although recognizing that they had broad responsibilities with respect to particular cases that were assigned to them, the court found that respondents had "very limited, if any, responsibility" with respect to the overall operation of the public defender's office. They did not "act as advisors or formulate plans for the implementation of the broad goals of the office" and, although they made decisions in the context of specific cases, "they do not make decisions about the orientation and operation of the office in which they work." 457 F. Supp., at 1291.

The District Court also rejected the argument that the confidential character of respondents' work justified conditioning their employment on political grounds. The court found that they did not occupy any confidential relationship to the policymaking process, and did not have access to confidential documents that influenced policymaking deliberations. Rather, the only confidential information to which they had access was the product of their attorney-client relationship with the office's clients; to the extent that such information was shared with the public defender, it did not relate to the formulation of office policy.

In light of these factual findings, the District Court concluded that petitioner could not terminate respondents' employment as assistant public defenders consistent with the First and Fourteenth Amendments. On appeal, a panel of the Second Circuit affirmed, specifically holding that the District Court's findings of fact were adequately supported by the record. That court also expressed "no doubt" that the District Court "was correct in concluding that an assistant public defender was neither a policymaker nor a confidential employee." We granted certiorari, 443 U. S. 904, and now affirm.

Petitioner advances two principal arguments for reversal: [6] First, that the holding in *Elrod* v. *Burns* is limited to situations in which government employees are coerced into pledging allegiance to a political party that they would not voluntarily support and does not apply to a simple requirement that an employee be sponsored by the party in power; and, second, that, even if party sponsorship is an unconstitutional condition of continued public employment for clerks, deputies, and janitors, it is an acceptable requirement for an assistant public defender.

---

[6] Petitioner also makes two other arguments. First, he contends that the action should have been dismissed because the evidence showed that he would have discharged respondents in any event due to their lack of competence as public defenders. See *Mt. Healthy City Board of Ed.* v. *Doyle*, 429 U. S. 274. The Court of Appeals correctly held this contention foreclosed by the District Court's findings of fact, which it found to be adequately supported by the record. In view of our settled practice of accepting, absent the most exceptional circumstances, factual determinations in which the district court and the court of appeals have concurred, we decline to review these and other findings of fact petitioner argues were clearly erroneous. See *Graver Mfg. Co.* v. *Linde Co.*, 336 U. S. 271, 275; *United States* v. *Ceccolini*, 435 U. S. 268, 273.

Second, relying on testimony that an assistant's term in office automatically expires when the public defender's term expires, petitioner argues that we should treat this case as involving a "failure to reappoint" rather than a dismissal and, as a result, should apply a less stringent standard. Petitioner argues that because respondents knew the system was a patronage system when they were hired, they did not have a reasonable expectation of being rehired when control of the office shifted to the Democratic Party. A similar waiver argument was rejected in *Elrod* v. *Burns*, 427 U. S. 347, 360, n. 13; see also *id.*, at 380 (POWELL, J., dissenting). After *Elrod*, it is clear that the lack of a reasonable expectation of continued employment is not sufficient to justify a dismissal based solely on an employee's private political beliefs.

Unlike MR. JUSTICE POWELL in dissent, *post*, at 526–532, petitioner does not ask us to reconsider the holding in *Elrod*.

## I

In *Elrod* v. *Burns* the Court held that the newly elected Democratic Sheriff of Cook County, Ill., had violated the constitutional rights of certain non-civil-service employees by discharging them "because they did not support and were not members of the Democratic Party and had failed to obtain the sponsorship of one of its leaders." 427 U. S., at 351. That holding was supported by two separate opinions.

Writing for the plurality, MR. JUSTICE BRENNAN identified two separate but interrelated reasons supporting the conclusion that the discharges were prohibited by the First and Fourteenth Amendments. First, he analyzed the impact of a political patronage system [7] on freedom of belief and association. Noting that in order to retain their jobs, the Sheriff's employees were required to pledge their allegiance to the Democratic Party, work for or contribute to the party's candidates, or obtain a Democratic sponsor, he concluded that the inevitable tendency of such a system was to coerce employees into compromising their true beliefs. [8] That conclusion, in

---

[7] MR. JUSTICE BRENNAN noted that many other practices are included within the definition of a patronage system, including placing supporters in government jobs not made available by political discharges, granting supporters lucrative government contracts, and giving favored wards improved public services. In that case, as in this, however, the only practice at issue was the dismissal of public employees for partisan reasons. 427 U. S., at 353; *id*, at 374 (opinion of STEWART, J.). In light of the limited nature of the question presented, we have no occasion to address petitioner's argument that there is a compelling governmental interest in maintaining a political sponsorship system for filling vacancies in the public defender's office.

[8] "An individual who is a member of the out-party maintains affiliation with his own party at the risk of losing his job. He works for the election of his party's candidates and espouses its policies at the same risk. The financial and campaign assistance that he is induced to provide to another party furthers the advancement of that party's policies to the detriment of his party's views and ultimately his own beliefs, and any assessment of his salary is tantamount to coerced belief. See *Buckley* v. *Valeo*, 424 U. S. 1,

his opinion, brought the practice within the rule of cases like *Board of Education* v. *Barnette,* 319 U. S. 624, condemning the use of governmental power to prescribe what the citizenry must accept as orthodox opinion.[9]

Second, apart from the potential impact of patronage dismissals on the formation and expression of opinion, MR. JUSTICE BRENNAN also stated that the practice had the effect of imposing an unconstitutional condition on the receipt of a public benefit and therefore came within the rule of cases like *Perry* v. *Sindermann,* 408 U. S. 593. In support of the holding in *Perry* that even an employee with no contractual right to retain his job cannot be dismissed for engaging in constitutionally protected speech, the Court had stated:

> "For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the govern-

---

19 (1976). Even a pledge of allegiance to another party, however ostensible, only serves to compromise the individual's true beliefs. Since the average public employee is hardly in the financial position to support his party and another, or to lend his time to two parties, the individual's ability to act according to his beliefs and to associate with others of his political persuasion is constrained, and support for his party is diminished." *Id.,* at 355–356.

MR. JUSTICE BRENNAN also indicated that a patronage system may affect freedom of belief more indirectly, by distorting the electoral process. Given the increasingly pervasive character of government employment, he concluded that the power to starve political opposition by commanding partisan support, financial and otherwise, may have a significant impact on the formation and expression of political beliefs.

[9] "Regardless of the nature of the inducement, whether it be by the denial of public employment or, as in *Board of Education* v. *Barnette,* 319 U. S. 624 (1943), by the influence of a teacher over students, '[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.' *Id.,* at 642." *Id.,* at 356.

ment may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.' *Speiser* v. *Randall,* 357 U. S. 513, 526. Such interference with constitutional rights is impermissible.

. . . . .

"Thus, the respondent's lack of a contractual or tenure 'right' to re-employment for the 1969–1970 academic year is immaterial to his free speech claim. Indeed, twice before, this Court has specifically held that the nonrenewal of a nontenured public school teacher's one-year contract may not be predicated on his exercise of First and Fourteenth Amendment rights. *Shelton* v. *Tucker,* [364 U. S. 479]; *Keyishian* v. *Board of Regents,* [385 U. S. 589]. We reaffirm those holdings here." *Id.,* at 597–598.

If the First Amendment protects a public employee from discharge based on what he has said, it must also protect him from discharge based on what he believes.[10] Under this line of analysis, unless the government can demonstrate "an over-

---

[10] "The Court recognized in *United Public Workers* v. *Mitchell,* 330 U. S. 75, 100 (1947), that 'Congress may not "enact a regulation providing that no Republican, Jew or Negro shall be appointed to federal office. . . ."' This principle was reaffirmed in *Wieman* v. *Updegraff,* 344 U. S. 183 (1952), which held that a State could not require its employees to establish their loyalty by extracting an oath denying past affiliation with Communists. And in *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 898 (1961), the Court recognized again that the government could not deny employment because of previous membership in a particular party." *Id.,* at 357–358.

riding interest," 427 U. S., at 368, "of vital importance," *id.*, at 362, requiring that a person's private beliefs conform to those of the hiring authority, his beliefs cannot be the sole basis for depriving him of continued public employment.

MR. JUSTICE STEWART'S opinion concurring in the judgment avoided comment on the first branch of MR. JUSTICE BRENNAN'S analysis, but expressly relied on the same passage from *Perry* v. *Sindermann* that is quoted above.

Petitioner argues that *Elrod* v. *Burns* should be read to prohibit only dismissals resulting from an employee's failure to capitulate to political coercion. Thus, he argues that, so long as an employee is not asked to change his political affiliation or to contribute to or work for the party's candidates, he may be dismissed with impunity—even though he would not have been dismissed if he had had the proper political sponsorship and even though the sole reason for dismissing him was to replace him with a person who did have such sponsorship. Such an interpretation would surely emasculate the principles set forth in *Elrod*. While it would perhaps eliminate the more blatant forms of coercion described in *Elrod*, it would not eliminate the coercion of belief that necessarily flows from the knowledge that one must have a sponsor in the dominant party in order to retain one's job.[11] More importantly, petitioner's interpretation would require the Court to repudiate entirely the conclusion of both MR. JUSTICE BRENNAN and MR. JUSTICE STEWART that the First Amend-

---

[11] As MR. JUSTICE BRENNAN pointed out in *Elrod*, political sponsorship is often purchased at the price of political contributions or campaign work in addition to a simple declaration of allegiance to the party. *Id.*, at 355. Thus, an employee's realization that he must obtain a sponsor in order to retain his job is very likely to lead to the same type of coercion as that described by the plurality in *Elrod*. While there was apparently no overt political pressure exerted on respondents in this case, the potentially coercive effect of requiring sponsorship was demonstrated by Mr. Finkel's change of party registration in a futile attempt to retain his position. See n. 4, *supra.*

ment prohibits the dismissal of a public employee solely because of his private political beliefs.

In sum, there is no requirement that dismissed employees prove that they, or other employees, have been coerced into changing, either actually or ostensibly, their political allegiance. To prevail in this type of an action, it was sufficient, as *Elrod* holds, for respondents to prove that they were discharged "solely for the reason that they were not affiliated with or sponsored by the Democratic Party." 427 U. S., at 350.

## II

Both opinions in *Elrod* recognize that party affiliation may be an acceptable requirement for some types of government employment. Thus, if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency. *Id.,* at 366. In *Elrod,* it was clear that the duties of the employees—the chief deputy of the process division of the sheriff's office, a process server and another employee in that office, and a bailiff and security guard at the Juvenile Court of Cook County—were not of that character, for they were, as MR. JUSTICE STEWART stated, "nonpolicy-making, nonconfidential" employees. *Id.,* at 375.[12]

---

[12] The plurality emphasized that patronage dismissals could be justified only if they advanced a governmental, rather than a partisan, interest. 427 U. S., at 362. That standard clearly was not met to the extent that employees were expected to perform extracurricular activities for the party, or were being rewarded for past services to the party. Government funds, which are collected from taxpayers of all parties on a nonpolitical basis, cannot be expended for the benefit of one political party simply because that party has control of the government. The compensation of government employees, like the distribution of other public benefits, must be justified by a governmental purpose.

The Sheriff argued that his employees' political beliefs did have a bearing on the official duties they were required to perform because political

As MR. JUSTICE BRENNAN noted in *Elrod*, it is not always easy to determine whether a position is one in which political affiliation is a legitimate factor to be considered. *Id.*, at 367. Under some circumstances, a position may be appropriately considered political even though it is neither confidential nor policymaking in character. As one obvious example, if a State's election laws require that precincts be supervised by two election judges of different parties, a Republican judge could be legitimately discharged solely for changing his party registration. That conclusion would not depend on any finding that the job involved participation in policy decisions or access to confidential information. Rather, it would simply rest on the fact that party membership was essential to the discharge of the employee's governmental responsibilities.

It is equally clear that party affiliation is not necessarily relevant to every policymaking or confidential position. The coach of a state university's football team formulates policy, but no one could seriously claim that Republicans make better coaches than Democrats, or vice versa, no matter which party is in control of the state government. On the other hand, it is equally clear that the Governor of a State may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments. In sum, the ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.

---

loyalty was necessary to the continued efficiency of the office. But after noting the tenuous link between political loyalty and efficiency where process servers and clerks were concerned, the plurality held that any small gain in efficiency did not outweigh the employees' First Amendment rights. *Id.*, at 366.

Having thus framed the issue, it is manifest that the continued employment of an assistant public defender cannot properly be conditioned upon his allegiance to the political party in control of the county government. The primary, if not the only, responsibility of an assistant public defender is to represent individual citizens in controversy with the State.[13] As we recently observed in commenting on the duties of counsel appointed to represent indigent defendants in federal criminal proceedings:

> "[T]he primary office performed by appointed counsel parallels the office of privately retained counsel. Although it is true that appointed counsel serves pursuant to statutory authorization and in furtherance of the federal interest in insuring effective representation of criminal defendants, his duty is not to the public at large, except in that general way. His principal responsibility is to serve the undivided interests of his client. Indeed, an indispensable element of the effective performance of his responsibilities is the ability to act independently of the government and to oppose it in adversary litigation." *Ferri* v. *Ackerman,* 444 U. S. 193, 204.

Thus, whatever policymaking occurs in the public defender's office must relate to the needs of individual clients and not to any partisan political interests. Similarly, although an assistant is bound to obtain access to confidential information arising out of various attorney-client relationships, that information has no bearing whatsoever on partisan political concerns. Under these circumstances, it would undermine, rather than promote, the effective performance of an assistant public

---

[13] This is in contrast to the broader public responsibilities of an official such as a prosecutor. We express no opinion as to whether the deputy of such an official could be dismissed on grounds of political party affiliation or loyalty. Cf. *Newcomb* v. *Brennan,* 558 F. 2d 825 (CA7 1977), cert. denied, 434 U. S. 968 (dismissal of deputy city attorney).

defender's office to make his tenure dependent on his allegiance to the dominant political party.[14]

Accordingly, the entry of an injunction against termination of respondents' employment on purely political grounds was appropriate and the judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE STEWART, dissenting.

I joined the judgment of the Court in *Elrod* v. *Burns,* 427 U. S. 347, because it is my view that, under the First and Fourteenth Amendments, "a nonpolicymaking, nonconfidential government employee can[not] be discharged . . . from a job that he is satisfactorily performing upon the sole ground of his political beliefs." *Id.,* at 375. That judgment in my opinion does not control the present case for the simple reason

---

[14] As the District Court observed at the end of its opinion, it is difficult to formulate any justification for tying either the selection or retention of an assistant public defender to his party affiliation:

"Perhaps not squarely presented in this action, but deeply disturbing nonetheless, is the question of the propriety of political considerations entering into the selection of attorneys to serve in the sensitive positions of Assistant Public Defenders. By what rationale can it even be suggested that it is legitimate to consider, in the selection process, the politics of one who is to represent indigent defendants accused of crime? No 'compelling state interest' can be served by insisting that those who represent such defendants publicly profess to be Democrats (or Republicans)." 457 F. Supp., at 1293, n. 13.

In his brief petitioner attempts to justify the discharges in this case on the ground that he needs to have absolute confidence in the loyalty of his subordinates. In his dissenting opinion, MR. JUSTICE STEWART makes the same point, relying on an "analogy to a firm of lawyers in the private sector." *Post,* at 521. We cannot accept the proposition, however, that there cannot be "mutual confidence and trust" between attorneys, whether public defenders or private practitioners, unless they are both of the same political party. To the extent that petitioner lacks confidence in the assistants he has inherited from the prior administration for some reason other than their political affiliations, he is, of course, free to discharge them.

that the respondents here clearly are not "nonconfidential" employees.

The respondents in the present case are lawyers, and the employment positions involved are those of assistants in the office of the Rockland County Public Defender. The analogy to a firm of lawyers in the private sector is a close one, and I can think of few occupational relationships more instinct with the necessity of mutual confidence and trust than that kind of professional association.

I believe that the petitioner, upon his appointment as Public Defender, was not constitutionally compelled to enter such a close professional and necessarily confidential association with the respondents if he did not wish to do so.*

MR. JUSTICE POWELL, with whom MR. JUSTICE REHNQUIST joins, and with whom MR. JUSTICE STEWART joins as to Part I, dissenting.

The Court today continues the evisceration of patronage practices begun in *Elrod* v. *Burns*, 427 U. S. 347 (1976). With scarcely a glance at almost 200 years of American political tradition, the Court further limits the relevance of political affiliation to the selection and retention of public employees. Many public positions previously filled on the basis of membership in national political parties now must be staffed in accordance with a constitutionalized civil service standard that will affect the employment practices of federal, state, and local governments. Governmental hiring practices long thought to be a matter of legislative and executive discretion now will be subjected to judicial oversight. Today's decision is an exercise of judicial lawmaking that, as THE CHIEF JUSTICE wrote in his *Elrod* dissent, "represents a significant intrusion into the area of legislative and policy concerns." *Id.*, at 375. I dissent.

---

*Contrary to repeated statements in the Court's opinion, the present case does not involve "private political beliefs," but public affiliation with a political party.

## I

The Court contends that its holding is compelled by the First Amendment. In reaching this conclusion, the Court largely ignores the substantial governmental interests served by patronage. Patronage is a long-accepted practice [1] that never has been eliminated totally by civil service laws and regulations. The flaw in the Court's opinion lies not only in its application of First Amendment principles, see Parts II–IV, *infra,* but also in its promulgation of a new, and substantially expanded, standard for determining which governmental employees may be retained or dismissed on the basis of political affiliation. [2]

---

[1] When Thomas Jefferson became the first Chief Executive to succeed a President of the opposing party, he made substantial use of appointment and removal powers. Andrew Jackson, the next President to follow an antagonistic administration, used patronage extensively when he took office. The use of patronage in the early days of our Republic played an important role in democratizing American politics. *Elrod* v. *Burns,* 427 U. S., at 378–379 (POWELL, J., dissenting). President Lincoln's patronage practices and his reliance upon the newly formed Republican Party enabled him to build support for his national policies during the Civil War. See E. McKitrick, Party Politics and the Union and Confederate War Efforts, in The American Party System 117, 131–133 (W. Chambers & W. Burnham eds. 1967). Subsequent patronage reform efforts were "concerned primarily with the corruption and inefficiency that patronage was thought to induce in civil service and the power that patronage practices were thought to give the 'professional' politicians who relied on them." *Elrod* v. *Burns,* 427 U. S., at 379 (POWELL, J., dissenting). As a result of these efforts, most federal and state civil service employment was placed on a nonpatronage basis. *Ibid.* A significant segment of public employment has remained, however, free from civil service constraints.

[2] The Court purports to limit the issue in this case to the dismissal of public employees. See *ante,* at 513, n. 7. Yet the Court also states that "it is difficult to formulate any justification for tying either the selection or retention of an assistant public defender to his party affiliation." *Ante,* at 520, n. 14. If this latter statement is not a holding of the Court, it at least suggests that the Court perceives no constitutional distinction between selection and dismissal of public employees.

In *Elrod* v. *Burns,* three Members of the Court joined a plurality opinion concluding that nonpolicymaking employees could not be dismissed on the basis of political affiliation. 427 U. S., at 367 (opinion of BRENNAN, J., with whom WHITE and MARSHALL, JJ., joined). Two Members of the Court joined an opinion concurring in the judgment and stating that nonpolicymaking, nonconfidential employees could not be so dismissed. *Id.,* at 375 (opinion of STEWART, J., with whom BLACKMUN, J., joined). Notwithstanding its purported reliance upon the holding of *Elrod, ante,* at 512, n. 6, the Court today ignores the limitations inherent in both views. The Court rejects the limited role for patronage recognized in the plurality opinion by holding that not all policymakers may be dismissed because of political affiliation. *Ante,* at 518–520. And the Court refuses to allow confidential employees to be dismissed for partisan reasons. *Ante,* at 520, n. 14; see *ante,* p. 520 (STEWART, J., dissenting). The broad, new standard is articulated as follows:

> "[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Ante,* at 518.

The Court gives three examples to illustrate the standard. Election judges and certain executive assistants may be chosen on the basis of political affiliation; college football coaches may not. *Ibid.*[3] And the Court decides in this case that

---

[3] The rationale for the Court's conclusion that election judges may be partisan appointments is not readily apparent. The Court states that "if a State's election laws require that precincts be supervised by two election judges of different parties, a Republican judge could be legitimately discharged solely for changing his party registration." *Ante,* at 518. If the mere presence of a state law mandating political affiliation as a requirement for public employment were sufficient, then the Legisla-

party affiliation is not an appropriate requirement for selection of the attorneys in a public defender's office because "whatever policymaking occurs in the public defender's office must relate to the needs of individual clients and not to any partisan political interests." *Ante*, at 519.

The standard articulated by the Court is framed in vague and sweeping language certain to create vast uncertainty. Elected and appointed officials at all levels who now receive guidance from civil service laws, no longer will know when political affiliation is an appropriate consideration in filling a position. Legislative bodies will not be certain whether they have the final authority to make the delicate line-drawing decisions embodied in the civil service laws. Prudent individuals requested to accept a public appointment must consider whether their predecessors will threaten to oust them through legal action.

One example at the national level illustrates the nature and magnitude of the problem created by today's holding. The President customarily has considered political affiliation in removing and appointing United States attorneys. Given the critical role that these key law enforcement officials play in the administration of the Department of Justice, both Democratic and Republican Attorneys General have concluded, not surprisingly, that they must have the confidence and support of the United States attorneys. And political affiliation has been used as one indicator of loyalty.[4]

Yet, it would be difficult to say, under the Court's standard, that "partisan" concerns properly are relevant to the performance of the duties of a United States attorney. This

---

ture of Rockland County could reverse the result of this case merely by passing a law mandating that political affiliation be considered when a public defender chooses his assistants. Moreover, it is not apparent that a State could demonstrate, under the standard approved today, that only a political partisan is qualified to be an impartial election judge.

[4] See Lemann, The Case for Political Patronage, The Washington Monthly, Dec. 1977, p. 8.

Court has noted that " '[t]he office of public prosecutor is one which must be administered with courage and independence.' " *Imbler* v. *Pachtman,* 424 U. S. 409, 423 (1976), quoting *Pearson* v. *Reed,* 6 Cal. App. 2d 277, 287, 44 P. 2d 592, 597 (1935). Nevertheless, I believe that the President must have the right to consider political affiliation when he selects top ranking Department of Justice officials. The President and his Attorney General, not this Court, are charged with the responsibility for enforcing the laws and administering the Department of Justice. The Court's vague, overbroad decision may cast serious doubt on the propriety of dismissing United States attorneys, as well as thousands of other policymaking employees at all levels of government, because of their membership in a national political party.[5]

A constitutional standard that is both uncertain in its application and impervious to legislative change will now control selection and removal of key governmental personnel. Federal judges will now be the final arbiters as to who federal, state, and local governments may employ. In my view, the Court is not justified in removing decisions so essential to

---

[5] The Court notes that prosecutors hold "broader public responsibilities" than public defenders. *Ante,* at 519, n. 13. The Court does not suggest, however, that breadth of responsibility correlates with the appropriateness of political affiliation as a requirement for public employment. Indeed, such a contention would appear to be inconsistent with the Court's assertion that the "ultimate inquiry is not whether the label 'policymaker' . . . fits a particular position. . . ." *Ante,* at 518.

I do not suggest that the Constitution requires a patronage system. Civil service systems have been designed to eliminate corruption and inefficiency not to protect the political beliefs of public employees. Indeed, merit selection systems often impose restrictions on political activities by public employees. D. Rosenbloom, Federal Service and the Constitution: The Development of the Public Employment Relationship 83–86 (1971); see *CSC* v. *Letter Carriers,* 413 U. S. 548 (1973). Of course, civil service systems further important governmental goals, including continuity in the operation of government. A strength of our system has been the blend of civil service and patronage appointments, subject always to oversight and change by the legislative branches of government.

responsible and efficient governance from the discretion of legislative and executive officials.

## II

The Court errs not only in its selection of a standard, but more fundamentally in its conclusion that the First Amendment prohibits the use of membership in a national political party as a criterion for the dismissal of public employees.[6] In reaching this conclusion, the Court makes new law from inapplicable precedents. The Court suggests that its decision is mandated by the principle that governmental action may not "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion. . . ." *Board of Education* v. *Barnette*, 319 U. S. 624, 642 (1943). The Court also relies upon the decisions in *Perry* v. *Sindermann*, 408 U. S. 593 (1972), and *Keyishian* v. *Board of Regents*, 385 U. S. 589 (1967). *Ante*, at 514–515; see *Elrod* v. *Burns*, 427 U. S., at 358–359 (opinion of BRENNAN, J.). But the propriety of patronage was neither questioned nor addressed in those cases.

Both *Keyishian* and *Perry* involved faculty members who were dismissed from state educational institutions because of their political views.[7] In *Keyishian*, the Court reviewed a

---

[6] In my *Elrod* dissent, I suggested that public employees who lose positions obtained through their participation in the patronage system have not suffered a loss of First Amendment rights. 427 U. S., at 380–381. Such employees assumed the risks of the system and were benefited, not penalized, by its practical operation. But the Court bases its holding on the First Amendment and, accordingly, I consider the constitutional issue.

[7] *Board of Education* v. *Barnette*, 319 U. S. 624 (1943), did not involve public employment. In that case, the Court declared that a state statute compelling each public school student to pledge allegiance to the flag violated the First Amendment. Similarly, *Wieman* v. *Updegraff*, 344 U. S. 183 (1952), *Shelton* v. *Tucker*, 364 U. S. 479 (1960), and *Cafeteria Workers* v. *McElroy*, 367 U. S. 886 (1961), did not concern governmental attempts to hire or dismiss employees pursuant to an established patronage system. The Court also relies upon *United Public Workers* v. *Mitchell*, 330 U. S. 75 (1947). *Ante*, at 515, n. 10. In that case, the Court upheld limitations

state statute that permitted dismissals of faculty members from state institutions for "treasonable or seditious" utterances or acts. The Court noted that academic freedom is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." 385 U. S., at 603. Because of the ambiguity in the statutory language, the Court held that the law was unconstitutionally vague. The Court also held that membership in the Communist Party could not automatically disqualify a person from holding a faculty position in a state university. *Id.*, at 606. In *Perry*, the Court held that the Board of Regents of a state university system could not discharge a professor in retaliation for his exercise of free speech. 408 U. S., at 598. In neither case did the State suggest that the governmental positions traditionally had been regarded as patronage positions. Thus, the Court correctly held that no substantial state interest justified the infringement of free speech. This case presents a question quite different from that in *Keyishian* and *Perry.*

The constitutionality of appointing or dismissing public employees on the basis of political affiliation depends upon the governmental interests served by patronage. No constitutional violation exists if patronage practices further sufficiently important interests to justify tangential burdening of First Amendment rights. See *Buckley* v. *Valeo*, 424 U. S. 1, 25 (1976). This inquiry cannot be resolved by reference to First Amendment cases in which patronage was neither involved nor discussed. Nor can the question in this case be answered in a principled manner without identifying and weighing the governmental interest served by patronage.

### III

Patronage appointments help build stable political parties by offering rewards to persons who assume the tasks necessary

---

on the political conduct of public employees that far exceed any burden on First Amendment rights demonstrated in this case.

to the continued functioning of political organizations. "As all parties are concerned with power they naturally operate by placing members and supporters into positions of power. Thus there is nothing derogatory in saying that a primary function of parties is patronage." J. Jupp, Political Parties 25–26 (1968). The benefits of patronage to a political organization do not derive merely from filling policymaking positions on the basis of political affiliation. Many, if not most, of the jobs filled by patronage at the local level may not involve policymaking functions.[8] The use of patronage to fill such positions builds party loyalty and avoids "splintered parties and unrestrained factionalism [that might] do significant damage to the fabric of government." *Storer* v. *Brown*, 415 U. S. 724, 736 (1974).

Until today, I would have believed that the importance of political parties was self-evident. Political parties, dependent in many ways upon patronage, serve a variety of substantial governmental interests. A party organization allows political candidates to muster donations of time and money necessary to capture the attention of the electorate. Particularly in a time of growing reliance upon expensive television advertisements, a candidate who is neither independently wealthy nor capable of attracting substantial contributions must rely upon party workers to bring his message to the voters.[9] In contests for less visible offices, a candidate may have no efficient method of appealing to the voters unless he enlists the efforts of persons who seek reward through the patronage system. Insofar as the Court's decision today

---

[8] See E. Costikyan, Behind Closed Doors: Politics in the Public Interest 253–254 (1966).

[9] Television and radio enable well-financed candidates to go directly into the homes of voters far more effectively than even the most well-organized "political machine." See D. Broder, The Party's Over: The Failure of Politics in America 239–240 (1972).

limits the ability of candidates to present their views to the electorate, our democratic process surely is weakened.[10]

Strong political parties also aid effective governance after election campaigns end. Elected officials depend upon appointees who hold similar views to carry out their policies and administer their programs. Patronage—the right to select key personnel and to reward the party "faithful"—serves the public interest by facilitating the implementation of policies endorsed by the electorate.[11] The Court's opinion casts a shadow over this time-honored element of our system. It appears to recognize that the implementation of policy is a legitimate goal of the patronage system and that some, but not all, policymaking employees may be replaced on the basis of their political affiliation. *Ante,* at 518.[12] But the Court

---

[10] Patronage also attracts persons willing to perform the jobs that enable voters to gain easy access to the electoral process. In some localities, "[t]he parties saw that the polls were open when they should be, and that the voting machines worked." Costikyan, Cities *Can* Work, Saturday Review, Apr. 4, 1970, pp. 19, 20. At a time when the percentage of Americans who vote is declining steadily, see Statistical Abstract of the United States 516 (1979), the citizen who distributes his party's literature, who helps to register voters, or who transports voters to the polls on Election Day performs a valuable public service.

[11] In addition, political parties raise funds, recruit potential candidates, train party workers, provide assistance to voters, and act as a liaison between voters and governmental bureaucracies. Assistance to constituents is a common form of patronage. At the local level, political clubhouses traditionally have helped procure municipal services for constituents who often have little or no other access to public officials. M. Tolchin & S. Tolchin, To The Victor . . . : Political Patronage from the Clubhouse to the White House 19 (1971). Party organizations have been a means of upward mobility for newcomers to the United States and members of minority groups. See *Elrod* v. *Burns,* 427 U. S., at 382, and n. 6 (POWELL, J., dissenting); S. Lubell, The Future of American Politics 76–77 (1952).

[12] The reasoning of the *Elrod* plurality clearly permitted vestiges of patronage to continue in order to ensure that "representative government not be undercut by tactics obstructing the implementation of policies of the new administration. . . ." 427 U. S., at 367. But in view of the

does not recognize that the implementation of policy often depends upon the cooperation of public employees who do not hold policymaking posts. As one commentator has written: "What the Court forgets is that, if government is to work, policy implementation is just as important as policymaking. No matter how wise the chief, he has to have the right Indians to transform his ideas into action, to get the job done." [13] The growth of the civil service system already has limited the ability of elected politicians to effect political change. Public employees immune to public pressure "can resist changes in policy without suffering either the loss of their jobs or a cut in their salary." [14] Such effects are proper when they follow from legislative or executive decisions to withhold some jobs from the patronage system. But the Court tips the balance between patronage and nonpatronage positions, and, in my view, imposes unnecessary constraints upon the ability of responsible officials to govern effectively and to carry out new policies.

Although the Executive and Legislative Branches of Government are independent as a matter of constitutional law, effective government is impossible unless the two Branches cooperate to make and enforce laws. Over the decades of our national history, political parties have furthered—if not assured—a measure of cooperation between the Executive and

Court's new holding that some policymaking positions may not be filled on the basis of political affiliation, *ante*, at 518, elected officials may find changes in public policy thwarted by policymaking employees protected from replacement by the Constitution. The official with a hostile or foot-dragging subordinate will now be in a difficult position. In order to replace such a subordinate, he must be prepared to prove that the subordinate's "private political beliefs [will] interfere with the discharge of his public duties." *Ante*, at 517.

[13] Peters, A Kind Word for the Spoils System, The Washington Monthly, Sept. 1976, p. 30.

[14] Tolchin & Tolchin, *supra* n. 11, at 72–73. See Costikyan, *supra* n. 8, at 353–354.

Legislative Branches. A strong party allows an elected executive to implement his programs and policies by working with legislators of the same political organization. But legislators who owe little to their party tend to act independently of its leadership. The result is a dispersion of political influence that may inhibit a political party from enacting its programs into law.[15] The failure to sustain party discipline, at least at the national level, has been traced to the inability of successful political parties to offer patronage positions to their members or to the supporters of elected officials.[16]

The breakdown of party discipline that handicaps elected officials also limits the ability of the electorate to choose wisely among candidates. Voters with little information about individuals seeking office traditionally have relied upon party affiliation as a guide to choosing among candidates. With the decline in party stability, voters are less able to blame or credit a party for the performance of its elected officials. Our national party system is predicated upon the assumption that political parties sponsor, and are responsible for, the performance of the persons they nominate for office.[17]

In sum, the effect of the Court's decision will be to decrease the accountability and denigrate the role of our national political parties. This decision comes at a time when an increasing number of observers question whether our national political parties can continue to operate effectively.[18]

[15] Herbers, The Party's Over for the Political Parties, The New York Times Magazine, Dec. 9, 1979, pp. 158, 175.

[16] See Costikyan, *supra* n. 8, at 252–253.

[17] In local elections, a candidate's party affiliation may be the most salient information communicated to voters. One study has indicated that affiliation remains the predominant influence on voter choice in low-visibility elections such as contests for positions in the state legislature. See Murray & Vedlitz, Party Voting in Lower-Level Electoral Contests, 59 Soc. Sci. Q. 752, 756 (1979).

[18] See, *e. g.*, W. Burnham, The 1976 Election: Has the Crisis Been Adjourned?, in American Politics and Public Policy 1, 19–22 (W. Burnham & M. Weinberg eds. 1978); Broder, *supra* n. 9; Herbers, *supra* n. 15,

Broad-based political parties supply an essential coherence and flexibility to the American political scene. They serve as coalitions of different interests that combine to seek national goals. The decline of party strength inevitably will enhance the influence of special interest groups whose only concern all too often is how a political candidate votes on a single issue. The quality of political debate, and indeed the capacity of government to function in the national interest, suffer when candidates and officeholders are forced to be more responsive to the narrow concerns of unrepresentative special interest groups than to overarching issues of domestic and foreign policy. The Court ignores the substantial governmental interests served by reasonable patronage. In my view, its decision will seriously hamper the functioning of stable political parties.

## IV

The facts of this case also demonstrate that the Court's decision well may impair the right of local voters to structure their government. Consideration of the form of local government in Rockland County, N. Y., demonstrates the antidemocratic effect of the Court's decision.

The voters of the county elect a legislative body. Among the responsibilities that the voters give to the legislature is the selection of a county public defender. In 1972, when the county voters elected a Republican majority in the legislature, a Republican was selected as Public Defender. The Public Defender retained one respondent and appointed the other as Assistant Public Defenders. Not surprisingly, both respondents are Republicans. In 1976, the voters elected a majority of Democrats to the legislature. The Democratic majority, in turn, selected a Democratic Public Defender who replaced both respondents with Assistant Public Defenders approved by the Democratic legislators. *Ante,* at 509–510, and n. 5.

at 159; Pomper, The Decline of the Party in American Elections, 92 Pol. Sci. Q. 21, 40–41 (1977). See also n. 9, *supra.*

The voters of Rockland County are free to elect their public defender and assistant public defenders instead of delegating their selection to elected and appointed officials.[19] Certainly the Court's holding today would not preclude the voters, the ultimate "hiring authority," from choosing both public defenders and their assistants by party membership. The voters' choice of public officials on the basis of political affiliation is not yet viewed as an inhibition of speech; it is democracy. Nor may any incumbent contend seriously that the voters' decision not to re-elect him because of his political views is an impermissible infringement upon his right of free speech or affiliation. In other words, the operation of democratic government depends upon the selection of elected officials on precisely the basis rejected by the Court today.

Although the voters of Rockland County could have elected both the public defender and his assistants, they have given their legislators a representative proxy to appoint the public defender. And they have delegated to the public defender the power to choose his assistants. Presumably the voters have adopted this course in order to facilitate more effective representative government. Of course, the voters could have instituted a civil service system that would preclude the selection of either the public defender or his assistants on the basis of political affiliation. But the continuation of the present system reflects the electorate's decision to select certain public employees on the basis of political affiliation.

The Court's decision today thus limits the ability of the voters of a county to structure their democratic government in the way that they please. Now those voters must elect both the public defender and his assistants if they are to fill governmental positions on a partisan basis.[20] Because voters

---

[19] In Florida, for example, the local public defender is elected. See Fla. Const., Art. 5, § 18; Fla. Stat. § 27.50 (1979).

[20] The Court's description of the policymaking functions of a public defender's office suggests that the public defender may no longer be chosen by the County Legislature on a partisan basis. *Ante,* at 519–520.

certainly may elect governmental officials on the basis of party ties, it is difficult to perceive a constitutional reason for prohibiting them from delegating that same authority to legislators and appointed officials.

## V

The benefits of political patronage and the freedom of voters to structure their representative government are substantial governmental interests that justify the selection of the assistant public defenders of Rockland County on the basis of political affiliation. The decision to place certain governmental positions within a civil service system is a sensitive political judgment that should be left to the voters and to elected representatives of the people. But the Court's constitutional holding today displaces political responsibility with judicial fiat. In my view, the First Amendment does not incorporate a national civil service system. I would reverse the judgment of the Court of Appeals.