1999-NMCA-079

982 P.2d 1064

**Rose SANDERS, Plaintiff–Appellant,**

**v.**

**Michael MONTOYA, In his Individual and official capacities, Defendant–Appellee.**

**No. 19,465.**

Court of Appeals of New Mexico.

May 19, 1999.

Vernon W. Salvador, Albuquerque, NM, for Appellant.

Judith C. Herrera, Eugene I. Zamora, Herrera, Long & Pound, P.A., Santa Fe, for Appellee.

## OPINION

HARTZ, Judge.

{1} Michael Montoya, the State Treasurer at the time, fired Rose Sanders from the position of liaison officer. Sanders sued Montoya under 42 U.S.C. § 1983 (1994) for violation of her rights under the United States Constitution, claiming that she was fired for political reasons. Montoya moved for summary judgment. Although he testified that he fired her for incompetence, he contended that he should prevail even if the firing was politically motivated because political loyalty is a valid requirement for the job of liaison officer. Sanders responded that she was performing only low-level clerical duties when she was fired and that such work does not require political loyalty. The principal legal issue in this case is whether the need for political loyalty should be based on the customary duties of the position or the actual duties being performed at the time of the firing. The district court granted Montoya summary judgment, ruling that he was entitled to qualified immunity. because the firing did not violate clearly established constitutional law. We affirm.

## BACKGROUND

{2} "Summary judgment is proper if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Roth v. Thompson*, 113 N.M. 331, 334, 825 P.2d 1241, 1244 (1992). The non-moving party is entitled to all reasonable inferences in support of its claim that an issue of material fact exists. *See Goodman v. Brock*, 83 N.M. 789, 793, 498 P.2d 676, 680 (1972). Therefore, we accept as true the evidence supporting Sanders' claim. We summarize the undisputed facts, together with the pertinent facts contained in Sanders' statement of material facts and those facts submitted by Montoya that are relied on by Sanders.

{3} When David King was elected State Treasurer in January 1991, Sanders began working as King's executive assistant liaison officer. Her duties included representing the State Treasurer's office before boards such as the Mortgage Finance Authority, the Educational Retirement Board, and the Border Authority. She was a participating member of the Martin Luther King, Jr. Holiday Commission and at times took King's place as a member of the Educational Retirement Board. When she acted as a board member, she had the authority to cast votes at her discretion. She also analyzed bills that were before the Legislature and prepared written responses. She issued press releases and spoke to civic groups as the representative of the State Treasurer's office. The official job description for the position at all material times was as follows:

## LIAISON OFFICER

### (LIAISON OFF)

*DEFINITION:*

Responsible for liaison and coordination activities with local, state and/or federal officials and agencies, in relation to agency programs.

*SUPERVISION AND GUIDELINES:*

Work is under direction. Guidelines include federal and state laws, professional journals and publications and policies and procedures.

*EXAMPLES OF WORK PERFORMED:*

Maintains contact with local, state and/or federal officials; keeps abreast on changing policies, laws, regulations and national trends; coordinates activities between local, state and federal programs; meets with federal and state specialists, local governmental officials and officials of public, civic, nonprofit and private agencies to collect information; prepares reports on activities; analyzes existing and proposed legislation to determine impact; and performs related work as required.

*DISTINGUISHING CHARACTERISTICS:*

Incumbents perform coordination and liaison activities at the local, state, and/or federal level with full responsibility to represent agency officials and present agen-

cy's viewpoints on various matters pertaining to agency programs.

*MINIMUM QUALIFICATIONS:*

1. Any combination of college education and/or experience in public relations work, liaison activities, work as a public information officer or related professional, administrative or program experience which required the development, establishment and maintenance of contacts with public officials totaling seven (7) years.

2. Considerable knowledge of state and federal legislation in pertinent areas; of informational materials and services; good knowledge of the method of developing public support and report preparation.

3. Ability to establish and maintain effective working relationships with public officials, civic leaders, public and private agencies and the general public; to express ideas, clearly and concisely.

*WORKING CONDITIONS:*

Extensive travel is required.

{4} In 1994 Montoya ran against King for the Democratic nomination for State Treasurer. Montoya won the nomination. On October 5, 1994, after the primary election but before Montoya took office, Sanders and Montoya talked by telephone. They discussed a sexual harassment suit pending against King, which had apparently been brought by three employees. Sanders expected to be deposed in that case. Although Montoya did not tell her what she should say in her deposition, Sanders understood Montoya to say that "if [she] didn't have favorable testimony against David, that [she] wouldn't be employed with [Montoya.]" Between October 5 and January 2, Sanders had no further contact with Montoya.

{5} Montoya began work as State Treasurer on Monday, January 2, 1995. Sanders met with Montoya twice on January 3. The first meeting began at 3:00 p.m. and lasted fifteen minutes. Sanders asked Montoya what her duties would be under his administration, but he did not give her an answer. Sanders and Montoya met again that evening from 5:30 to 7:00 p.m. The first thing they discussed was King's sexual harassment case. Montoya asked her if she thought King sexually harassed the three women, and she said "No." When Sanders asked again what her duties would be under Montoya's administration, Montoya told her that he would think about where he would place her and tell her in the morning.

{6} The next morning Montoya showed Sanders to her new office and told her that she would be working under his Administrative Assistant, Dolly Davenport. Sanders again asked what her duties would be, and Montoya said, "We will see." He told Sanders that Davenport would be assigning her duties. He also told her that she would no longer have her own computer. During that first week Davenport gave her several assignments, including putting labels on mailboxes, answering phones, compiling a list of office staff, and compiling a list of the current members of various boards.

{7} On January 9, 1995, Davenport wrote a memo to Deputy State Treasurer Robert Andermann, stating that she had assigned Sanders to type a list on the computer and that it had become clear that Sanders did not know how to use a computer. Two days later Davenport wrote another memo to Andermann, complaining that Sanders did not put the date on a letter she was assigned to type. On January 12 Montoya informed Sanders in writing that as of January 1, 1995, she was no longer the State Treasurer's designee for the Martin Luther King, Jr. Holiday Commission. On January 16 Montoya terminated Sanders' employment effective January 27. The termination letter, signed by Montoya, stated, "The basis for the dismissal is that your performance has not met the standards for the office in that you were unable to complete tasks as assigned."

{8} Montoya testified as follows: He fired Sanders for the reason stated in the dismissal letter, upon Andermann's recommendation. Montoya never talked to Sanders or anyone else about what Sanders' job should be. He left this and other personnel decisions to Andermann. He never had a "sit-down" conversation with Sanders until the day he told her she was fired, and that meeting lasted only two to three minutes.

He did not really know what her duties were while she worked for him. He did not know what her duties had been under King. He did not know whether her duties changed from one administration to the next. He did not know whether she had supported King, except that he had seen her with a sign. In fact, he stated, "I really don't know who Rose Sanders is."

{9} In granting summary judgment the district court ruled in part:

3. It is clear that the intent of the position of Liaison Officer gives the office holder the full authority to represent the state treasurer and the programs of the state treasurer's office with other federal, state and local governmental authorities, among other things.

4. The duties of Liaison Officer include duties for which political loyalty is a bonafide [sic] requirement for the job, regardless of what specific duties the plaintiff was perfo.·ming.

5. The law was not clearly established that the position of Liaison Officer is protected by the First Amendment's prohibition against political retaliation, so that a reasonable public official in the position of defendant Montoya would not know that the Liaison Officer's position was one that would require political loyalty.

## DISCUSSION

{10} "Section 1983 provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert*, 526 U.S. 286, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999). Here, Sanders contends that Montoya violated her rights to freedom of association and free speech guaranteed by the First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment. *See Elrod v. Burns*, 427 U.S. 347, 356–57, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion of J. Brennan). (She also raised claims under the New Mexico Constitution but has abandoned them on appeal.)

■ {11} Montoya's potential liability is limited, however, by the doctrine of qualified immunity. When exercising a discretionary function, a government official is not liable for damages under § 1983 unless the challenged conduct "violate[d] clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

■ {12} The precise meaning of "clearly established" is not settled, although we have held that "a legal point is clearly established ... when it has been decided by either the highest state court where the cause of action arose, by a United States court of appeals, or by the United States Supreme Court." *Yount v. Millington*, 117 N.M. 95, 101, 869 P.2d 283, 289 (Ct.App.1993). In any event, by any reasonable construction of the term "clearly established," Montoya's actions did not violate clearly established First Amendment rights of Sanders. As we shall explain, certain government positions require political loyalty. A person holding such a position has no First Amendment protection against being dismissed for political reasons. The prevailing view in the courts appears to be that in evaluating a claim that a dismissal violated the worker's First Amendment rights, one looks to the duties of the position, not the specific work being performed by the worker at the time of the dismissal. Because the job of liaison officer, as set forth in the official job description and as performed by Sanders during the tenure of Treasurer King, was one requiring political loyalty, the prevailing view would be that Sanders had no constitutional protection against a political dismissal.

{13} The United States Supreme Court first addressed the constitutionality of patronage dismissals in *Elrod*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547. The plaintiff government employees alleged that they had been dismissed by the newly-elected sheriff because they were not Democrats and had not obtained Democratic sponsors. The Court held that they had stated a claim under the First and Fourteenth Amendments for violation of their right of freedom of association. The scope of the opinion was uncertain because only two other Justices joined Justice Brennan's lead opinion. The

concurring opinion of Justice Stewart, joined by Justice Blackmun, stated:

> The single substantive question involved in this case is whether a nonpolicymaking, nonconfidential government employee can be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs. I agree with the plurality that he cannot.

*Id.* at 375, 96 S.Ct. 2673.

{14} The Court revisited the issue in *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), in which it spoke through a majority opinion. It held that an assistant public defender could not be fired on the basis of party affiliation. It stated that "the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 518, 100 S.Ct. 1287; *accord O'Hare Truck Servs., Inc. v. City of Northlake,* 518 U.S. 712, 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996); *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 71, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). In describing the type of positions that are exempt from such First Amendment protections, the Court observed that "the Governor of a State may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments." *Branti,* 445 U.S. at 518, 100 S.Ct. 1287.

{15} There is little question that the position of liaison officer to the New Mexico State Treasurer is exempt from First Amendment protection under *Branti.* According to the official job description, a liaison officer is "[r]esponsible for liaison and coordination activities with local, state and/or federal officials and agencies, in relation to agency programs ... with full responsibility to represent agency officials and present agency's viewpoints." Sanders represented State Treasurer King before various boards and commissions, and had authority to cast votes at her discretion. Sanders also spoke to the press and to civic groups as a representative of the State Treasurer's office. She advised the State Treasurer of pending legislation that might affect his agency. Sanders expressed policy as a spokesperson for the agency, and she had meaningful input into policy development as the Treasurer's liaison to boards, commissions, and the Legislature. The liaison officer is indistinguishable from the gubernatorial assistants mentioned in Branti as examples of positions for which political loyalty can be required.

{16} Sanders does not really challenge that proposition. Rather, she rests her argument on the fact that she did not perform such sensitive tasks once Montoya became State Treasurer. She urges this Court to decide this case based on her actual duties under the Montoya administration rather than on the full scope of possible duties of a liaison officer.

{17} But the case law is to the contrary. The federal courts look to the duties of the position, not the specific tasks of the particular incumbent who is suing. The influential decision in *Tomczak v. City of Chicago,* 765 F.2d 633, 640–41 (7th Cir.1985), analyzed the issue as follows:

> This court ... notes that *Elrod* and *Branti* require examination of the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office. Thus, if an officeholder performs fewer or less important functions than usually attend his position, he may still be exempt from the prohibition against political terminations if his position inherently encompasses tasks that render his political affiliation an appropriate prerequisite for effective performance. In this court's reiteration of the *Branti* formulation, we emphasized the functions of the office involved, not the officeholder: "The test is whether the *position* held by the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Nekolny v. Painter,* 653 F.2d 1164, 1170 (7th Cir.1981) (emphasis added). The unarticulated purpose behind this approach seems

to be two-fold: first, to resolve the issue entirely in one proceeding, thereby relieving the courts of the burden of having to reexamine a certain position every time a new administration changes the mix of responsibilities bestowed upon the officeholder; and, second, to provide certainty to litigants.

(Citations omitted.) *Tomczak* has been followed by the other circuits that have addressed the issue. *See O'Connor v. Steeves,* 994 F.2d 905, 911 (1st Cir.1993) (absent ambiguities in official job description, focus is on powers inherent in office); *Wetzel v. Tucker,* 139 F.3d 380, 383–84 (3d Cir.1998) (focus is on function of the office, not on the actual past duties of employee); *Williams v. City of River Rouge,* 909 F.2d 151, 154 (6th Cir.1990) (focus is on inherent duties, regardless of work actually performed); *Bauer v. Bosley,* 802 F.2d 1058, 1064 (8th Cir.1986) (same); *Green v. Henley,* 924 F.2d 185, 186 (10th Cir.1991) (per curiam) (examine powers inherent in office).

{18} On the basis of this law, one can readily reject Sanders' complaint that her firing "was a political ruse to open a slot for a political ally." That is precisely what the law permits. She held a *position* that Montoya was justified in filling with a political ally—no one else would be suitable.

{19} Sanders relies on language in *Horton v. Taylor,* 767 F.2d 471, 477 (8th Cir. 1985), *Meeks v. Grimes,* 779 F.2d 417, 420–21 (7th Cir.1985), and *Dickeson v. Quarberg,* 844 F.2d 1435, 1441–42 (10th Cir.1988), to support her view that some federal circuits examine the actual duties of an officeholder rather than the "inherent powers" of the office. We disagree that these cases deviate to any substantial extent from the inherent-powers test.

{20} *Horton* involved the patronage dismissal of road-graders who were employed by the county judge in a rural area. *See* 767 F.2d at 472–73. The trial court upheld their dismissal on the ground that their conduct influenced how the public perceived the job performance of the county judge and that they were the county judge's "alter-egos" in the public's perception. *See id.* at 475. The Eighth Circuit rejected this argument, observing that the road-graders' responsibility was to grade roads, not to speak for the judge or to influence policy in the county. It was in this context that the court stated that "[t]he *Branti* test is a functional one, focusing on the actual duties an employee performs." *Id.* at 477. The Court explained:

> To hold otherwise would require us to reject the functional test of *Branti* and essentially hold that in *any* office of a small, rural county the unwritten, personal relationship between the office-holder and his subordinates as perceived by the residents of the county could override the specific, actual duties of the employees.

*Id.* at 478. The distinction being made was not between inherent duties and actual duties but between the worker's actual duties and conduct not essential to the job. If there was any ambiguity in the Court's view, that ambiguity was resolved by a later Eighth Circuit opinion that explicitly followed *Tomczak* on the issue. *See Bauer,* 802 F.2d at 1064.

{21} In *Meeks,* 779 F.2d at 417, the question was whether several bailiffs were subject to political dismissal. The Seventh Circuit observed:

> [I]t is impossible to generalize about the nature of an individual type of position, such as bailiff or secretary; job responsibilities and duties can vary greatly between different governmental units or even within a governmental unit. For example, the plaintiffs are classified under the general heading of bailiffs but their responsibilities differed substantially. For this reason the test under *Branti* must be applied to each individual office, and status under that formulation is left to the trier of fact to be determined.

*Id.* at 420–21 n. 2 (citation omitted). We do not interpret this passage to be contrary to *Tomczak.* Instead, we read it merely as saying that the issue is job duties, as opposed to titles. This reading is confirmed by the Court's order to the lower court. It said: "On remand the district court should focus on the inherent powers of the office of the bailiff for the Gary City Court rather than what these plaintiffs actually did or what the defendant plans for them to do." *Id.* at 424.

{22}  *Dickeson*, 844 F.2d at 1437, involved the alleged patronage dismissal by the sheriff of a head jailer and a special deputy.  Neither position had a formal job description.  *See id.* at 1443.  The Court quoted from *Tomczak*, *Horton*, and *Meeks*.  Because the only evidence regarding job duties was testimony about the duties performed by the plaintiffs, it is unclear whether the Court was adopting a standard that was not dependent on inherent job duties.  But the later Tenth Circuit decision in *Green* squarely adopted the *Tomczak* approach.  *See Green*, 924 F.2d at 186.

{23}  Hence, Montoya's qualified immunity cannot be defeated by any change in Sanders' duties as liaison officer after Montoya took office.  Montoya is entitled to such immunity unless at the time of Sanders' dismissal the law was clearly established that the First Amendment issue turned on her actual work rather than the inherent duties of the office.  As we have seen, however, the overwhelming weight of authority is, and was, just the opposite—the inherent duties are the proper consideration.

{24}  Because Montoya is entitled to qualified immunity, we need not concern ourselves with his actual state of mind.  The United States Supreme Court adopted the "clearly established" test as an objective standard to avoid the burdens imposed on government officials that arise from a subjective good-faith test.  *See Harlow*, 457 U.S. at 816–19, 102 S.Ct. 2727.  Consequently, it is irrelevant whether we agree with Sanders that Montoya could not have thought that political loyalty was an appropriate requirement for a person in Sanders' position because he did not know or care what her position was.  Even if his alleged use of a pretext to fire her would show that he understood that he could not fire her for political reasons, her suit must fail because the law was not clearly established that the liaison officer was protected against political dismissal.

{25}  Finally, we address Sanders' free-speech claim.  Sanders testified that on October 5, 1994, Montoya led her to believe that if she did not testify in a manner unfavorable to King in her upcoming deposition in the sexual harassment lawsuit, then Montoya would dismiss her after he took office.  Her arguments in district court and on appeal appear to refer to this conversation primarily as evidence of Montoya's anti-King political motive for firing her.  But her citation to *Melton v. City of Oklahoma City*, 879 F.2d 706, 714 (10th Cir.1989), *rev'd en banc in part on other grounds*, 928 F.2d 920, 922 (10th Cir.1991), suggests that she may also be claiming that her dismissal was in retaliation for her exercise of her First Amendment right to free speech.  *Melton*, 879 F.2d at 711–17, held that the First Amendment protected a police officer against being fired for testifying on behalf of a criminal defendant.  *See O'Connor*, 994 F.2d at 911–12, (even though plaintiff, a public works superintendent, could be fired on the basis of political affiliation, his First Amendment right to free speech may have been violated if he was fired for disclosing misconduct by the defendant.)

{26}  Had Sanders proved retaliation for her deposition testimony, she may have had a proper claim against Montoya for violation of her right to free speech.  But she has failed to allege, much less produce evidence, that she ever testified at a deposition or that her actual testimony motivated Montoya to dismiss her.  She does not argue that she was fired because of something she said.  Although it would have been highly improper for Montoya (or anyone else) to threaten Sanders in order to influence her deposition testimony, she fails to explain how the threat gives rise to a cause of action in the absence of any allegation that she succumbed to the threat or he carried it out.  We therefore hold that Sanders is not entitled to reversal of the summary judgment based on a free-speech claim.

## CONCLUSION

{27}  For the above reasons we affirm the judgment of the district court.

{28}  **IT IS SO ORDERED.**

ALARID and BOSSON, JJ., concur.