**Thomas R. RAKER, et al., Plaintiffs,**

v.

**The CITY OF CHARLESTON, et al., Defendants.**

**Civ. A. No. 2:91–0697.**

United States District Court, S.D. West Virginia, Charleston Division.

Jan. 27, 1992.

James B. Lees, Jr., Hunt & Wilson, Charleston, W.Va., for plaintiffs.

Thomas M. Hayes, Charleston, W.Va., for defendant City of Charleston.

L. Anthony George, Jackson & Kelly, Charleston, W.Va., for defendant Kent Strange Hall.

### MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending are Defendants' motions for summary judgment and Plaintiffs' motion for summary judgment. The Court GRANTS the Defendants' motions, DENIES the Plaintiffs' motion, and ORDERS this action dismissed and stricken from the docket of the Court.

### I.

Under *Rule* 56(c), Federal Rules of Civil Procedure, summary judgment is proper only:

> "[I]f the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."

A principal purpose of summary judgment is to isolate and dispose of meritless litigation. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). However, once the moving party has met its initial burden, the burden shifts to the nonmoving party to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552. To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. As will become

apparent, the Court has concluded summary judgment is appropriate.

## II.

The essential facts necessary to resolve the motion for summary judgment are not in dispute. The Defendant Kent Strange Hall was elected Mayor of the City of Charleston on April 15, 1991. He was sworn in on the evening of May 6, 1991, and assumed office that night. The next day, May 7, 1991, Mayor Hall discharged each Plaintiff. All of the Plaintiffs were "G–Level" employees, meaning they were exempt from civil service protections and served at the "will and pleasure" of the Mayor.

The Plaintiffs filed this action alleging their discharge was part of an unconstitutional political patronage practice. Plaintiff Thomas R. Raker was employed by the City of Charleston as the Deputy Director of Parks, Recreation and Public Grounds. Plaintiff James Douglas Thomas, Jr. was the City Traffic Engineer. Plaintiff Michelle Y. Reed was the Executive Director of the Charleston Human Rights Commission. Plaintiff David G. Lowe was the City's Director of Housing for the Charleston Housing Improvement Program (CHIP). Plaintiff Albert Sahley was the City's Parking Systems Manager. As will become apparent, the Court concludes that none of the Plaintiffs' jobs are protected from termination for political affiliation.

## III.

■ It is well settled that patronage dismissals of certain public employees violates the rights to freedom of political belief and association protected by the First Amendment to the United States Constitution. *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). *Miller v. Board of Education of the County of Lincoln,* 450 F.Supp. 106 (S.D.W.Va.1978). Not all patronage dismissals violate the employees' constitutional rights. Patronage dismissals of governmental officials holding policymaking positions are justified "to ensure

that policies which the electorate has sanctioned are effectively upheld." *Elrod v. Burns,* 427 U.S. at 372, 96 S.Ct. at 2689.

■ Instead of focusing on the term "policy-maker", the Supreme Court has defined the issue as "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel,* 445 U.S. at 518, 100 S.Ct. at 1295. Patronage dismissals should not be disturbed by the judiciary if party affiliation is an appropriate requirement for the job. *Delong v. U.S.,* 621 F.2d 618 (4th Cir.1980).

To properly render a decision on the propriety of a patronage dismissal, the United States Court of Appeals for the Fourth Circuit has adopted the two-part test articulated by an *en banc* panel of the First Circuit. *Stott v. Hawthorne,* 916 F.2d 134, 141–42 (4th Cir.1990), *citing Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236, 241–242 (1st Cir.1986), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987). The relevant parts of this two-part test are as follows:

"A threshold inquiry ... involves examining whether the position at issue, no matter how policy-influencing or confidential it may be, relates to partisan political interests ... [or] concerns. That is, does the position involve government decision making on issues where there is room for political disagreement on goals or their implementation? Otherwise, stated, do party goals or programs affect the direction, pace, or quality of governance?

If this first inquiry is satisfied, the next step is to examine the particular responsibilities of the position to determine whether it resembles a policy maker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement.... The relevant inquiry is to the function of the public office in question and not the actual duties of the particular employee involved."

*Stott v. Hawthorne,* 916 F.2d at 141–42, (citations and quotations omitted).

■ To determine whether a particular employee is protected from patronage dismissal, "the critical and dispositive question is whether a particular position is one that requires, as a qualification for its performance, political affiliation." *Stott v. Hawthorne,* 916 F.2d at 143. If a position is one that requires political affiliation for its performance, then dismissal or demotion is within the bounds of the Constitution. *Id.*

■ Based upon the foregoing principles of law, the Court must determine whether each Plaintiff was protected from political dismissal. In this case, all of the Plaintiffs were exempt from civil service protection and there is a presumption at law that their discharge was proper. *Stott v. Hawthorne,* 916 F.2d at 142.

### IV.

#### A. *Thomas R. Raker*

■ The Plaintiff Thomas R. Raker was a Deputy Director of Parks, Recreation and Public Grounds. Under the Hall administration, the duties of a Deputy Director of Parks, Recreation and Public Grounds were expanded to include implementation of a new program as well as oversee the parks, recreation and public grounds. The revised duties included full responsibility for a new after school recreation program which was a campaign promise made by Mayor Hall.

The Plaintiff has wholly failed to rebut the presumption at law that Raker's patronage discharge is proper since the position was exempt from civil service protection. Moreover, the position of a Deputy Director of Parks, Recreation and Public Grounds is not subject to protection from patronage dismissal under the *Elrod–Branti* analysis. The position relates to partisan political interests or concerns since it involves the implementation of a new governmental program which was a significant aspect of Mayor Hall's political campaign. The position also falls squarely within that of a policy maker, communicator, or some other position for which party affiliation is an appropriate requirement. The Deputy Director carries the responsibility of creating and implementing an entirely new governmental program. As the Mayor's principal spokesperson, the Deputy Director must serve as coordinator and communicator with other governmental entities to ensure the viability of the new program. Political affiliation is a vital requirement to the performance of these duties.

#### B. *James Douglas Thomas, Jr.*

■ Mr. Thomas occupied the position of City Traffic Engineer. An important duty of the City Traffic Engineer is to work closely with committee of the Charleston City Council to recommend placement of traffic signs in accordance with the wishes of Council members' constituents. Duties also include consulting with other City agencies including the Police Department, the City Planning Office, the Building Commissioner's Office, the Chief City Engineer and the Mayor's Office of Economic Development. The City Traffic Engineer deals directly with the public in receiving complaints regarding traffic and parking and deals with representatives of City Council regarding constituent complaints.

The function of the position of City Traffic Engineer involves government decision making on issues where there is room for political disagreement. The manner of dealing with citizen complaints and the implementation of traffic policies involve matters of interest to voters which may be handled differently by different political administrations. The City Traffic Engineer is also a policy maker and communicator in Mayor Hall's administration. The duties of the City Traffic Engineer in dealing with the public and City Council implicate political patronage as a qualification for efficient performance of the administration's policies. Moreover, the Plaintiff James Thomas Douglas, Jr. has failed to rebut the presumption at law that the position of City Traffic Engineer is a position subject to patronage dismissal since it is exempt from civil service protection.

## C. *Michelle Y. Reed*

■ Michelle Y. Reed was the Director of the Charleston Human Rights Commission. The Charleston Human Rights Commission is basically responsible for dealing with all complaints of discrimination in Charleston relating to employment, public accommodations, housing accommodations and real property. The Commission conducts public hearings on discrimination complaints and is further empowered to enter into consent orders. The Board must work with other governmental units as well as the community at large to promote an understanding of civil rights. The Executive Director of the Charleston Human Rights Commission is charged with the duty of overseeing all of these functions of the Human Rights Commission.

The Executive Director must make recommendations to the Mayor and City Council on policy matters. Ms. Reed, as Executive Director, was prominently in the public eye. She conducted numerous training sessions, conducted "outreach" programs in coordination with other groups, served on numerous boards, served as the City's Affirmative Action representative and worked closely with various other governmental entities.

The function of the position of Executive Director of the Charleston Human Rights Commission is of a politically sensitive nature. There is great room for political disagreement on the goals and their implementation under the Charleston Human Rights Commission. The Executive Director influences the pace of government by deciding what types of cases to pursue more aggressively than others. The Executive Director is also a communicator and decision maker within the *Elrod–Branti* analysis. The interaction of the Executive Director with so many citizens and various governmental agencies places the Director in a significant position for representing the administration's public image. This position as a communicator, as well as being a policy maker, clearly places the Executive Director within the second prong of the *Elrod–Branti* analysis.

Thus, political affiliation is a qualification for the performance of the Executive Director's position. Moreover, the Executive Director position is one exempt from civil service protection and the Plaintiff has failed to rebut the presumption that her discharge was lawful.

## D. *David G. Lowe*

■ David G. Lowe was discharged by Mayor Hall from his duties as the Director of Housing for the Charleston Housing Improvement Program (CHIP). CHIP is the City of Charleston's agency which provides housing improvement assistance on behalf of low income individuals. Under this program the City of Charleston administers federal money by making loans or grants to individuals under various programs.

The position of Director of CHIP involves supervising a staff, reviewing applications for assistance, working with contractors, working with landlord associations, and working with various federal, state and local agencies. Mr. Lowe performed these tasks and exercised a great deal of discretion in implementing the various projects.

The Director of Housing for the Charleston Housing Improvement Program involves government decision making on issues where there is room for political disagreement on goals or their implementation. Deciding which projects to pursue impacts the allocation of the limited amount of resources. There is obvious room for political disagreement as to which projects are the most deserving of funding.

The Director of CHIP is the top person in that agency who acts as the agency's decision maker and communicator. Party affiliation is an appropriate qualification for the performance of the duties of the Director of CHIP. Accordingly, the Court concludes that the Plaintiff David G. Lowe was not protected from patronage dismissal under an *Elrod—Branti* analysis.

Moreover, the position of the Director of CHIP is one that is exempt from civil service protection. The Plaintiff David G. Lowe has failed to rebut the presumption at law that his discharge was proper since he enjoyed no civil service protection.

### E. *Albert Sahley*

 The final Plaintiff, Albert Sahley, served as the City of Charleston's Parking Systems Manager prior to his discharge. The Parking Systems Manager is basically responsible for the upkeep and maintenance of the City's parking buildings, supervision of the City's "meter maids," overseeing the collection of coins from the City parking meters, and the hiring, firing and supervision of the cashiers and other employees of the City's parking buildings and parking lots. The Parking Systems Manager serves as the City's representative when negotiating rates of rent with businesses using office space in the City's parking buildings. The Parking Systems Manager is also responsible for all public complaints regarding the City's parking system and the Systems Manager has the power to cancel parking tickets.

There are many issues left to the discretion of the City Parking Systems Manager on which there is room for political disagreement on goals or their implementation.

The policies surrounding the marketing and rental of office space directly impacts upon the City's revenues and the policies surrounding enforcement of parking tickets affects public perception of the administration. Government decision making on these and other goals or their implementation involve issues where there is room for political disagreement.

The Parking Systems Manager is also a policy maker and a communicator. The job requires the director to have input into hiring and firing of all employees, to prepare a budget, to recommend rental rates, and to be responsible for marketing strategies. These tasks along with the daily involvement of dealing with complaints from the public sufficiently establish that the function of the Systems Manager is to be both a policy maker and a communicator.

Under the *Elrod–Branti* analysis, the position of a Parking Systems Manager is subject to patronage dismissal. Moreover the position of City Parking Systems Manager is exempt from civil service protec-

tion. Albert Sahley has failed to rebut the presumption at law that his patronage dismissal was proper.

### V.

The Court concludes that the City of Charleston employees in the following positions are subject to removal based on their political affiliation: Deputy Director of Parks, Recreation and Public Grounds; City Traffic Engineer; Executive Director of the Charleston Human Rights Commission; Director of Housing for the Charleston Housing Improvement Program; and Parking Systems Manager. Accordingly, the Court GRANTS the Defendants' motions for summary judgment, DENIES the Plaintiffs' motion for summary judgment and ORDERS this action dismissed and stricken from the docket of the Court.