RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2002 FED App. 0117P (6th Cir.)
File Name: 02a0117p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

CAROLYN SUE HAGER,
      _Plaintiff-Appellant,_

     _v._

PIKE COUNTY BOARD OF
EDUCATION and FRANK
WELCH, individually, and in
his official capacity as
Superintendent of Pike
County Schools,
      _Defendants-Appellees._

No. 00-6227

Appeal from the United States District Court
for the Eastern District of Kentucky at Pikeville.
No. 99-00293—Joseph M. Hood, District Judge.

Argued: October 9, 2001

Decided and Filed: March 29, 2002

Before: JONES and MOORE, Circuit Judges; HAYNES,
District Judge.

_____

* The Honorable William J. Haynes, Jr., United States District Judge
for the Middle District of Tennessee, sitting by designation.

———————

**COUNSEL**

———————

**ARGUED:** James Follace Fields II, BROOKS & McCOMB, Lexington, Kentucky, for Appellant. Robert L. Chenoweth, CHENOWETH LAW OFFICE, Frankfort, Kentucky, for Appellees. **ON BRIEF:** James Follace Fields II, Arthur L. Brooks, BROOKS & McCOMB, Lexington, Kentucky, for Appellant. Robert L. Chenoweth, John C. Fogle III, CHENOWETH LAW OFFICE, Frankfort, Kentucky, for Appellees.

———————

**OPINION**

———————

NATHANIEL R. JONES, Circuit Judge. Carolyn Sue Hager ("Hager"), a teacher and program coordinator in the Pike County schools, appeals the district court's grant of summary judgment to the Pike County Board of Education ("Board") and Frank Welch ("Welch") on her claims of retaliatory demotion and reassignment for political expression and association. Hager alleges that (1) under 42 U.S.C. § 1983, her demotion and reassignment violated her rights under the First and Fourteenth Amendments, and (2) under Kentucky state statutes, the actions violated a prohibition against demotion or discrimination against school employees for political activities. Defendants claim entitlement to qualified immunity because the reassignment was for non-political economic and efficiency reasons or they were permitted to take politics into account in their personnel decisions under the *Elrod/Branti* exceptions to the general rule against government employment actions based on political affiliations. Applying *the Elrod/Branti* exceptions, the district court found politics was an appropriate requirement for the position and no constitutional violation exists. We disagree with the court's finding on the *Elrod/Branti* exceptions and conclude that a genuine issue of material fact exists as to whether plaintiff was demoted and

As noted above, on the issue of qualified immunity, the district court did not engage in a full burden-shifting analysis to determine whether Hager was demoted and reassigned for the exercise of her First Amendment rights to political expression and association. Moreover, the district court did not adequately consider the statutory prohibitions under Kentucky law. As we find that the *Elrod/Branti* exceptions do not apply here, we conclude there is at least a genuine issue of material fact as to whether the demotion and reassignment was in retaliation for Hager's political conduct and, as such, whether a constitutional or statutory violation exists in this matter.

There is a genuine issue of material fact as to whether the defendants have violated plaintiff's clearly established rights in this matter. Therefore, defendants are not entitled to qualified immunity and summary judgment is inappropriate.

## III. CONCLUSION

Almost sixty years ago, the Supreme Court admonished that "[i]f there is any fixed star in our constitutional constellation, it is that no official high or petty, can prescribe what shall be orthodox in politics . . . or other matters of opinion or force citizens to confess by word or act their faith therein." *Bd. of Educ. v. Barnett*, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). Subsequently, this court recognized that teaching is one of the oldest and most respected professions, and noted that the "Kentucky Legislature has gone to great lengths to ensure and protect the continued professionalism of the state's public school teachers." *Crawley v. Bd. of Educ.*, 658 F.2d 450, 452 (6th Cir. 1981) (citations omitted). These words ring equally true today.

For the above reasons, we **REVERSE** the decision of the district court granting summary judgment to defendants and **REMAND** for further proceedings on Hager's claim of retaliation based on her rights of political expression and association under the First and Fourteenth Amendments, and on her pendent state law claims for violations under Kentucky law.

In sum, although it is possible that the G&TT/C may make some decisions while implementing the GTP, we hold that Welch "simply has not carried [his] burden of demonstrating that political loyalty is '*essential* to the discharge of [the position's] governmental responsibilities.'"*Christian*, 888 F.2d at 416 (quoting *Branti*, 445 U.S. at 518) (emphasis added). Thus, we find this position does not reasonably fit under either Category Two or Three and is not one in which political affiliation is an appropriate requirement under the *Elrod/Branti* exceptions.

In addition to the *Elrod/Branti* exceptions, there is an additional factor that the district court did not adequately consider in its determination that politics was an appropriate requirement for the G&TT/C position. Kentucky statutory law clearly establishes that a teacher or employee of a school district has the right to be free from demotion or discrimination based on political affiliation. KRS § 161.164(4) ( "[n]o teacher or employee of any district board of education shall be . . . demoted or dismissed from, any position or in any way . . . discriminated against with respect to employment because of [her] political . . . affiliations."); *see also Sowards*, 203 F.3d at 439 n.4 ("it is important to examine the applicable state and local law when deciding whether political considerations may be used in employment decisions . . . ."). The existence of the Kentucky statute as protection against political reprisal such as occurred in this case has been clearly established by the Kentucky courts for many years. *See Calhoun v. Cassady*, 534 S.W.2d 806, 808 (Ky. 1976) (statute enacted to prevent Superintendent and Board from perpetrating transfers and demotions as political "vendettas" for supporting candidates opposed to Superintendent in race for office)*; see also Harlan County Bd. of Educ. v. Stagnolia*, 555 S.W.2d 828, 830 (Ky. Ct. App. 1977) ("Political reprisals by superintendents and a majority of board members brought about the enactment of KRS 161.162 which prohibits such action."). The existence of this long-standing prohibition raises significant question as to the legitimacy of the defendants's actions in this matter.

reassigned in violation of her clearly established rights. Therefore, we conclude that the defendants are not entitled to summary judgment on the issue of qualified immunity. Thus, we **REVERSE** and **REMAND** for further proceedings in Hager's retaliation suit against the Board and Welch.

## I.  FACTS

On January 4, 1988, Hager was hired by the Pike County School District as an elementary school teacher and taught in that capacity through the 1996-97 school year. Prior to May 1997, Hager openly and actively supported Reo Johns ("Johns") in a political race for Board appointment as Pike County School District Superintendent. Johns's opponent in the race was defendant Welch. Johns won and was appointed Superintendent. In May 1997, Johns appointed Hager to the position of Gifted and Talented  Teacher/Coordinator ("G&TT/C"). The duties of the position include teaching gifted and talented students and overseeing various aspects of the District's Gifted and Talented Program ("GTP"). Once in the position, Hager obtained her state gifted and talented teaching certification and program coordination endorsement. When Hager took the G&TT/C position, it paid a salary of $20,000, which was fully funded by a grant from the Kentucky Department of Education ("KDE").

As G&TT/C, Hager spent the majority of her time providing direct services to students, and the remainder administering the GTP. Her office was in the District central office but she also traveled to local schools to work with the GTP teachers and students. She worked closely with Johns and his administration to build and improve the GTP by creating and implementing several new local programs, obtaining additional grants, and identifying an increased number of eligible students. She also regularly conferred with the State GTP Consultant, Laura Pekhonen ("Pekhonen"). Hager received excellent personnel evaluations and the District and Hager received national recognition for achievement in the program. In May 1998, Johns retired as Superintendent.  The Board appointed Brenda Gooslin

("Gooslin") as Interim Superintendent. Hager's close working relationship on the GTP continued with Gooslin and her administration.

Between May and August 1998, Welch and Gooslin were opposing candidates for Board appointment as Superintendent. As she had with Johns, Hager openly and actively supported Gooslin against Welch. In August 1998, Welch won and was appointed Superintendent After he became Superintendent, Welch did little to learn about the GTP or what Hager was doing or had done with the program, or about the grant monies and state requirements regarding the program. Hager and Welch had virtually no interaction during his first nine months as Superintendent. Hager considered herself an outcast in the new administration.

At some point prior to April 15, 1999, Welch decided to eliminate the paid G&TT/C position and reassign the duties to another central office employee in an unpaid capacity. His intent was to distribute the $20,000 G&TT/C salary to local schools and teachers for use in their gifted and talented programs. He believed this arrangement was a more economic and efficient use of district resources. Welch allegedly based this decision on feedback and advice obtained from individuals inside and outside his administration, including his mentors and Pekhonen.

On April 15, 1999, Hager was called to an unscheduled meeting with Welch, his Assistant Superintendent Paul Dotson ("Dotson"), and District Personnel Director David Lester ("Lester") in Welch's office. In the meeting, Welch informed Hager that, due to a state budget deficit and instructions Welch had received from the KDE, there was a need for restructuring in the school district. Welch informed Hager that, as part of the restructuring, he was recommending to the Board that it abolish the G&TT/C position for the next school year. Welch also told Hager that she would be reassigned to classroom teaching at the elementary school level, with a salary reduction of $28,000 and no responsibilities in the GTP. Hager attempted to inform the

budget allocations, or if that responsibility had been delegated to the Coordinator." J.A. at 22.

In *McCloud v. Testa*, 227 F.3d 424, 2000 WL 1269405 (6th Cir. Sept. 8, 2000) (*McCloud II*), the court addressed the argument that there is an "inextricable connection between politics and funds" such that any budgetary discretion means Category Two designation is appropriate. *Id*. at *4. In that case, the plaintiff, an administrator of the budgets and settlements division, had the primary function to settle and distribute hundreds of millions of tax dollars to political subdivisions and approve the budgets of those subdivisions. *Id*. The court considered whether the ministerial duties of an administrator were inherently political and dismissal of the administrator was appropriately required because of this political connection to money. *Id*. The court found that because there were factual disputes concerning the administrator's budgetary functions that should be resolved at trial, summary judgment was inappropriate. *Id.*

Here, the duties envisioned for the new position holder do not indicate a delegation of discretionary authority from Welch to Belcher. Clearly, Welch tells Belcher what to do in the position. We are not persuaded by Belcher's testimony that she designs policy; on the contrary, from her recitation of actual duties, it appears that she performs solely ministerial tasks with no policymaking functions. Moreover, there is no indication in the record that Belcher has any budgetary discretion. The record reflects that Belcher works with Welch, Pekhonen, and the local GTP teacher/coordinators on developing and implementing the program. Nevertheless, it appears that she has little if any discretion or is delegated any policymaking powers. Therefore, although there is some historical question as to the extent of delegated discretion regarding budgetary matters, we believe that the G&TT/C is clearly not delegated the type of broad discretionary authority for policymaking decisions on the order of a "deputy secretary of labor" who sets an annual legislative agenda. Thus, this position does not reasonably fall under Category Two.

whom the secretary of labor has delegated the responsibility of crafting the department's annual legislative agenda." *McCloud I*, 97 F.3d at 1557. Moreover, "[i]n determining whether an employee occupies a policymaking position, consideration should . . . be given to whether the employee . . . formulates plans for the implementation of broad goals." *Faughender*, 927 F.2d at 914; *see also Rice,* 14 F.3d at 1142 n.9 (broad responsibilities, not well defined ones, make it more likely that a job is a policymaking position). Category Two exists "to capture those who would otherwise be category one policymakers, except that the federal government, state, county, or municipality has chosen for whatever reason not to set out the requirements of such a position in statute, ordinance, or regulation." *McCloud I*, 97 F.3d at 1557 n.31.

It is defendants's contention that the broad discretionary powers in this position are in the oversight of the budget and allocation of state gifted and talented funds. As to the inherent duties, state regulations provide explicit definitions and requirements for local program development, implementation, personnel, funding, and other aspects of the GTP. 704 KAR 3:285. Local districts do create and implement local GTP policies and procedures, including budgets and plans for those programs, subject to KDE review. *Id.* at § 2; KRS §157.224(4). The Board Policy and job description provide the position-holder with oversight responsibilities for the operation of the District GTP and "the expenditure of funds for gifted education to ensure those funds are used to provide direct services to students," J.A. at 41, 43. The coordinator is also required to evaluate the program and report the results of these evaluations directly to the Board. J.A. at 43. Although the inherent duties are well-stated as to ministerial functions, there is no clearly defined extent to which the G&TT/C is delegated discretionary *policymaking* authority regarding program implementation or budgetary matters. The district court recognized this factual question when it stated "[i]t is unclear whether the superintendent made the discretionary decisions concerning

men that there were state statutory and regulatory requirements for the GTP which prohibited abolition of the G&TT/C position. According to Hager, Welch stated that he would research the state requirements and get back to her. Hager asserts that at the end of the meeting Welch told her that she was not to speak with anyone about the meeting or what was said in it.

In the days following the April 15th meeting, Hager did not hear from Welch again. She did, however, speak individually with Dotson and Lester in an attempt to learn the reasons for the restructuring and whether she would have any duties in the GTP. She claims that she was met with derision and contempt. Soon thereafter, Welch recommended that the Board abolish the G&TT/C position and the Board followed the recommendation. The Board subsequently established new positions in the program, including "Title 1 and Title 6 Gifted and Talented Coordinator" and "Title 1 Assistant Coordinator." Hager applied for both positions, but her applications were denied. Prior to the 1999-2000 school year, Welch assigned the G&TT/C duties to central office employee Maritta Belcher ("Belcher"), on a part-time basis and in addition to Belcher's full-time duties as the District's Instructional Technology Coordinator. Belcher performs the ministerial coordinator duties but does not teach in the GTP.

On August 18, 1999, Hager filed suit in the District Court for the Eastern District of Kentucky, seeking injunctive relief and damages for violation of her First and Fourteenth Amendment rights of free speech, expression, and association, and pendent state law claims for wrongful demotion or discrimination based on political activities. She asserted that the G&TT/C position was never really abolished, but that she was demoted and reassigned entirely out the GTP in retaliation for political support of candidates opposed to Welch and his allies. After discovery, defendants moved for summary judgment based on qualified immunity, claiming that Welch had reassigned Hager for economic and efficiency reasons or that Hager was in a position that required political affiliation and, therefore, she could be reassigned for political

reasons under the *Elrod/Branti* exceptions to the general rule against government employment actions based on political activities.

On August 9, 2000 the district court granted defendants's motion. The court applied the *Elrod/Branti* exceptions and determined that the G&TT/C was either a confidential advisor to the Superintendent or a direct delegate of significant discretionary authority to carry out policies of political concern, and, thus, in a position that required political loyalty. Based on this determination, the court held that Hager could be removed from the G&TT/C position and reassigned without a constitutional violation. Finding no genuine issues of material fact, the court dismissed the federal claims and did not address the pendent state law claims. Plaintiff filed a timely appeal to this court.

## II.  DISCUSSION

### A.  Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). This court reviews *de novo* a grant of summary judgment. *Brooks v. Am. Broad. Co.*, 999 F.2d 167, 174 (6th Cir. 1993). When reviewing a motion for summary judgment, we must draw all justifiable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *Christian v. Belcher*, 888 F.2d 410, 413 (6th Cir. 1989). The moving party has the burden of showing the absence of genuine factual disputes from which a reasonable jury could return a verdict for the plaintiff. *See Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In considering whether summary judgment is appropriate, this court must "look beyond the pleadings and assess the proof to determine whether there is

Reviewing the inherent duties of the G&TT/C and the position as envisioned by Welch and presently performed by Belcher, this position falls outside Category Three. The position requires seventy-five percent direct teaching service to students and the G&TT/C cannot therefore spend considerable time advising the Superintendent in the way that a law clerk advises a judge. Although the court has noted that the nature of a ministerial position may involve elements of confidentiality and trust, s*ee Blair v. Meade*, 76 F.3d. 97, 101 (6th Cir. 1996), we believe the district court overemphasized the *confidential* nature of the position and the amount of *advising* involved in the relationship between the Superintendent and the G&TT/C. The position is either teaching or ministerial and there are no indications that the G&TT/C deals with political issues, advises the Superintendent on confidential information, or controls the lines of communication to the Superintendent. Thus, the G&TT/C does not include the extent of confidentiality inherent in positions of this category. Therefore, Category Three does not reasonably apply in this case.

### (b).  Category Two

Defendants argue that the G&TT/C has broad discretionary policymaking authority delegated from the Board and the Superintendent as to planning and implementing the GTP, especially regarding budgetary matters. A Category Two position holder receives a "significant portion of the total discretionary authority available to the category one position holder," such as "a deputy secretary of labor in a state, to

---

confidentiality, accuracy and loyalty. ALVIN B. RUBIN & LAURA B. BARTELL, LAW CLERK HANDBOOK 1, 16 (1989). Similarly, secretaries to a judge "help maintain the library, assemble documents, serve as courtroom crier, . . . run errands for the judge . . . and assist in the day-to-day conduct of court business." FEDERAL JUDICIAL CENTER, CHAMBERS HANDBOOK FOR JUDGE'S LAW CLERKS AND SECRETARIES 1 (1994). They "often deal with lawyers and members of the public on the judge's behalf," and must be "sensitive to the many demands on the judges and should help shield them from unnecessary encroachments on their time." *Id*. at 1-2.

(Hager Dep.).    Based on this characterization of the close working relationship between Hager and Johns, and later with Gooslin, defendants claim that the G&TT/C is a "confidential advisor" to the Superintendent and therefore falls under Category Three. In opposition, Hager argues that a person in the position as written cannot spend "a considerable portion of their time" advising others because seventy-five percent of the position time must be spent providing direct services to students. Next, she asserts that defense counsel's questions in her deposition regarding "confidential" discussions and "trust" issues between herself and Johns mis-characterized the relationship between the Superintendent and G&TT/C. She avers she was not a "confidential advisor" to either Johns or Gooslin. Ultimately, Hager submits that in all aspects of their relationship, Johns was her "boss" and she was at all times taking directions as a subordinate employee.  J.A. at 57 (Hager Dep.).

In *Sowards*, the court summarized the Category Three position as involving "employees who control the lines of communication to category one or category two position-holders.  This category is concerned with the position-holder's access to confidential, political information transmitted to the policymaker, which requires political loyalty." 203 F.3d at 437 (citations omitted).  In *McCloud I*, this court compared the Category Three position to "a judge's law clerk or legal secretary." 97 F.3d at 1557. Like a mayor or other political office holder's assistant, the duties of a law clerk of legal secretary to a judge involve access to confidential and political material, as well as controlling the lines of communication to the judge. *See Faughender*, 927 F.2d at 913 (holding duties of mayor's secretary are inherently political). Neither position appears analogous to the position at issue here.[1]

---

[1] Law clerks spend the vast majority of their time doing legal research, preparing bench memoranda, drafting orders and opinions, editing and proofreading the judge's orders and opinions, verifying citations, and discussing and conferring with the judge about pending cases and decisions, all in a relationship based on complete

a genuine need for trial." *Sowards v. Loudon County*, 203 F.3d 426, 431 (6th Cir. 2000).

The sole issue on appeal is the legal question of whether defendants are entitled to summary judgment based on qualified immunity.   Under the doctrine of qualified immunity, "government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).  Thus, to determine if such entitlement exists, the court must conduct a two-part analysis: (1) whether the plaintiff has shown a violation of a constitutionally or statutorily protected right; and, (2) whether that right was clearly established such that a reasonable government official would have realized that their action was in violation of that right. *Sowards,* 203 F.3d at 438.

## B.   Violation of a constitutional right

Hager argues that her demotion and reassignment were in retaliation for the exercise of her constitutional rights to political expression and association.  These rights are well-established under the Constitution.  *See e.g., Rutan v. Republican Party of Illinois*, 497 U.S. 62, 69, 110 S.Ct. 2729, 111 L.Ed. 2d 52 (1990) (quoting *Elrod v. Burns*, 427 U.S. 347, 356, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) (plurality opinion)) ("'Political belief and association constitute the core of those activities protected by the First Amendment.'"). Moreover, "even practices that only potentially threaten political association are highly suspect." *McCloud v. Testa,* 97 F.3d 1536, 1552 (6th Cir. 1996), *cert. denied*, 522 U.S. 914 (1997) (*McCloud I*).

The defendants argue that Hager was in a position that allowed the defendants to consider political affiliation in their personnel decisions under the *Elrod/Branti* exceptions to the general prohibition against government employment decisions based on political activities.  The district court agreed and found no violation of a constitutional right.  "Whether

political affiliation is an appropriate consideration for a government position is a question of law." *Sowards*, 203 F.3d at 435. Therefore, to obtain summary judgment, defendants must establish that no genuine issues of material fact exist as to "'whether political affiliation may appropriately be considered with respect to the position in question.'" *Id.* (quoting *Feeney v. Shipley*, 164 F.3d 311, 314 (6th Cir. 1999)).

It is well-settled that public employees enjoy First Amendment freedoms of political belief and association, however, if the exercise of those rights interferes with the discharge of public duties, then the rights may have to yield to the government's interest in maintaining effectiveness and efficiency. *Elrod*, 427 U.S. at 366. "Limiting patronage dismissals to policymaking positions is sufficient to achieve the valid governmental objective of preventing holdover employees from undermining the ability of a new administration to implement its policies." *Id.* In contrast, "'[n]onpolicymaking individuals usually have only limited responsibilities and are therefore not in a position to thwart the goals of the in-party.'" *Hall v. Tollett*, 128 F.3d 418, 422 (6th Cir. 1997) (quoting *Elrod*, 427 U.S. at 367). Therefore, "the single substantive question . . . is whether a nonpolicymaking, nonconfidential government employee can be discharged or threatened with discharge from a job that [she] is satisfactorily performing upon the sole ground of [her] political beliefs." *Elrod,* 427 U.S. at 375 (Stewart, J., concurring). This question extends beyond the context of firings, to include areas such as transfers, promotions, and recalls from layoffs. *Rutan*, 497 U.S. at 64. Abolition of positions, reassignments, and/or demotions are also included. *See id*; *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999) (en banc). Thus, to avoid a constitutional violation in instances of patronage, the hiring authority must "demonstrate that party affiliation is an *appropriate requirement* for the effective performance of the public office involved." *Branti v. Finkel*, 445 U.S. 507, 518, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) (emphasis added).

Category Two: positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of named jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions;

Category Three: confidential advisors who spent a considerable portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority, or other confidential employees who control the lines of communication to category one positions, category two positions, or confidential advisors;

Category Four: positions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies.

97 F.3d at 1557. The court has stated that a government position "need not fall neatly within one of the categories" to be entitled to the exception. *Sowards*, 203 F.3d at 436. However, should the position fit into one of the categories *with reasonable certainty*, then political affiliation is an appropriate requirement and a public employee may be adversely affected without violating her constitutional rights. *Id.* at 435, 436 (emphasis added).

Defendants claim that the G&TT/C position falls under either Category Three or Two and the district court agreed. Hager argues that the position falls outside the *McCloud I* categories. We believe the district court erred in its application of the category schema.

**(a). Category Three**

During Hager's deposition, defense counsel characterized Hager as Johns's "right hand person" for the GTP. J.A. at 75

working with Pekhonen on developing the program. Although the state requirements and the Board job description requires that seventy-five percent of the G&TT/C time be spent providing direct services to gifted and talented students, at the time of her deposition, Belcher had not been teaching or providing similar direct services because she had been identifying students and finding lost records. She admitted that as the job description for the G&TT/C position is now written, it would not be possible for her to provide the seventy-five percent direct services and appropriately perform her duties as Instructional Technology Coordinator. Specifically, Belcher described her actual tasks as: she goes out to the local schools and talks to the local coordinators; reviews documentation regarding students; discusses the means for acquiring more documentation to identify students; learns what types of instructions are taking place in the classroom; and, determines how the instruction is being documented. Belcher has also arranged for professional development training for the local gifted and talented coordinators on several topics, including the Kentucky school law pertaining to the gifted and talented students; service options for the students; gathering data and parental permission; and, forming local school committees for the program. In sum, Belcher labeled her gifted and talented coordinator duties as "ministerial." J.A. at 62 (Belcher Dep.).

## 2. *McCloud I* Categories

Defendants assert that the *Elrod/Branti* exceptions apply to this position. In *McCloud I*, this court developed a four-part schema for classifying whether public employment positions fall under the *Elrod/Branti* exception for patronage actions and, therefore, political affiliation is an appropriate requirement for consideration in affecting these positions:

Category One: positions specifically named in relevant federal, state, county or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted;

## 1. Gifted and Talented Teacher/Coordinator position

To determine whether political affiliation is an appropriate requirement, a reviewing court "must look beyond the mere job title and examine the *actual duties* of the specific position." *Hall*, 128 F.3d at 423 (emphasis added). As such, it is the inherent duties of the position itself *and* the duties as envisioned for the new holder which must be examined, *Faughender v. City of North Olmsted*, 927 F.2d 909, 913 (6th Cir. 1991) (emphasis in original), rather than the duties as performed by the person holding the position at the time of the alleged violation. *Williams v. City of River Rouge*, 909 F.2d 151, 154 (6th Cir. 1990). Where positions are defined by statute or regulation, this definition is entitled to some deference by a reviewing court. *Rice v. Ohio Dep't of Transp.*, 14 F.3d 1133, 1143 (6th Cir. 1994).

## (a) Inherent duties

Kentucky law clearly defines the state's gifted and talented programs and its coordinator and teacher positions. The Kentucky General Assembly has committed the Commonwealth to providing a comprehensive educational program for its "exceptional children and youth," with the KDE coordinating, directing, and monitoring the program. Ky. Rev. Stat. Ann. §157.224 (Banks-Baldwin 2001) ("KRS"); 704 Ky. Admin. Regs. 3:285 (2001) ("KAR"). Gifted and talented students are defined under exceptional children and youth. The KDE has promulgated extensive regulations defining and explaining the requirements for gifted and talented programs. *See generally*, 704 KAR 3:285. Under the regulations, local school districts shall ensure that direct services are provided to students by professionally qualified and certified personnel. *Id*. at 3:285 § 8. Moreover, state funds for gifted education are required to be used for direct services to gifted and talented students, and seventy-five percent of a district's gifted education fund allocation must be used to employ the properly certified personnel to provide direct instructional services. *Id*. at 3:285 § 9(1). Additionally, under the regulations, each school district

receiving state gifted education funds must designate a "gifted education coordinator" to:

(a) Oversee the district gifted education operation;
(b) Serve as liaison between the district and the state;
(c) Ensure internal compliance with state statutes and administrative regulation; and
(d) Administer and review the gifted education program budget.

*Id*. at 3:285, § 9(3).

The Pike County Board of Education recognized and incorporated these requirements into the Board's "Gifted and Talented Policy." J.A. at 42-43. Combining the teaching and coordinating responsibilities, the Board established the "Itinerant Gifted and Talented Coordinator" or G&TT/C position, with this job description:

The Gifted and Talented Teacher/Coordinator shall oversee the operation of the District's Gifted and Talented Program and assist schools in implementing the provisions and policies set forth by the Kentucky Department of Education. The Gifted and Talented Teacher/Coordinator shall oversee the expenditure of funds for gifted education to ensure those funds are used to provide direct services to identified students. The Gifted and Talented Teacher/Coordinator shall meet the requirements for certificate endorsement as established in Kentucky Administrative Regulation.

He/she shall coordinate the annual, on-going process of evaluating all aspects of the gifted program and make recommendations for upgrading those areas found to be deficient.

He/she shall provide direct services to students who are gifted and talented. Seventy-five percent of the Teacher Coordinator's time shall be spent directly teaching gifted students. Twenty-five percent of their time shall be spent coordinating the program.

He/she will serve as liaison between the district and the state, ensure internal compliance with state statutes and administrative regulations.

J.A. at 41. The inherent duties of the G&TT/C position as described in the Board's GTP Policy and position job description clearly designate that seventy-five percent of the position time must be spent teaching gifted and talented students and the remaining twenty-five percent is to be spent on administration of the program.

**(b)  Duties of New Holder**

The second prong of the position analysis considers the duties as envisioned for the new holder. *Faughender*, 927 F.2d at 913. Welch testified that he believed it was unnecessary for the G&TT/C position to be a full-time position. Rather, in his view, the duties could be accomplished by an employee already operating in the District's central office. After Robinson declined the position, Welch assigned the duties to Belcher, the District's Instructional Technology Coordinator. Consequently, Belcher is the District's full-time Instructional Technology Coordinator and the part-time Gifted and Talented Coordinator. Belcher receives no additional compensation for the new duties.

From the record, it appears that Belcher answers to and takes virtually all her direction on the GTP from Welch. She testified that she had never seen the Board job description before her deposition. J.A. at 60 (Belcher Dep.). Belcher is neither certified nor endorsed for the position by training in the gifted and talented area, but does have the "grandfather" teaching eligibility based on years of service. She stated that she "design[s]" program policy at Welch's direction, and if she did something that did not meet with Welch's approval, then he would let her know and they would either change the policy or she could argue the point. J.A. at 61-62 (Belcher Dep.). Belcher also stated, however, that she has been