*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0392P (6th Cir.)
File Name: 03a0392p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

ANNA LEA JUSTICE,
            *Plaintiff-Appellant,*

v.                                          No. 01-6156

PIKE COUNTY BOARD OF
EDUCATION and FRANK
WELCH,
            *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Pikeville.
No. 99-00399—Joseph M. Hood, District Judge.

Argued: March 25, 2003

Decided and Filed: November 4, 2003

Before: BOGGS, Chief Circuit Judge; SILER, Circuit
Judge; and STEEH, District Judge.[*]

---

[*] The Honorable George C. Steeh, United States District Judge for the
Eastern District of Michigan, sitting by designation.

## COUNSEL

**ARGUED:** Jeremiah A. Collins, BREDHOFF & KAISER,
Washington, D.C., for Appellant. Robert L. Chenoweth,
CHENOWETH LAW OFFICE, Frankfort, Kentucky, for
Appellees. **ON BRIEF:** Jeremiah A. Collins, BREDHOFF
& KAISER, Washington, D.C., for Appellant. Robert L.
Chenoweth, John C. Fogle III, CHENOWETH LAW
OFFICE, Frankfort, Kentucky, for Appellee.

## OPINION

BOGGS, Chief Circuit Judge. Plaintiff Anna Lea Justice
appeals the district court's grant of summary judgment to
defendants, the Pike County Board of Education ("Board")
and its superintendent, Frank Welch, in her free speech and
disability discrimination action. Justice, a certified teacher,
worked as Grants Department Director for the Board. When
Welch became the new superintendent, after a campaign in
which Justice supported his opponents, he abolished the
grants department and reassigned Justice to the classroom.
Rather than comply, Justice sought and received a pension
based on her physical inability to perform some classroom
duties. The district court rejected Justice's claim that she had
been terminated from her grants department position in
retaliation for her political affiliation because her position was
of a type allowing political discrimination. The district court
rejected Justice's disability discrimination claim because
Justice, in seeking a state teacher's disability pension, had
implicitly denied her status as a qualified individual under the
ADA. We reverse on both issues.

## I

Justice was a certified teacher in the Pike County school system under the Kentucky Teacher's Tenure Act, Ky. Rev. Stat. § 161.720-161.841. She worked as a teacher from 1981 through 1989 and held various administrative positions from 1989 through 1995. In November 1995, the Board, at the initiative of the then-school superintendent, Reo Johns, created a grants department and appointed Justice its director. Her job description, largely drafted by Justice herself, was as follows:

**JOB GOAL:**
The Grants Department Director is responsible for seeing that the goals and objectives of the Grants Department are achieved.
**DESCRIPTION OF DUTIES:**
1. *Write Grant Proposals:* Spearhead the research, planning, and proposal writing for submission of proposals to federal, state, and foundation funding sources.
2. *Program Monitoring and Evaluation:* Monitor and evaluate funded programs according to guidelines as set forth in the proposal and evaluate program strengths and weaknesses.
3. *Establish and Monitor School-Based Grant Teams:* Select, train and work with teachers at each school who are part of the Pike County grant team.
4. *Spearhead Proposal Development:* Work with committees in various disciplines to develop goals, objectives, and budgets.
5. *Conduct Needs Assessments:* Plan for and conduct needs assessments to determine needs for program development.
6. *Locate funding sources for the district:* Research funding sources for specific needs.
7. *Provide Technical Assistance:* Provide technical assistance on an as needed basis to school staff and provide grant writing workshops for teachers and administrative staff.
8. *Professional Development:* Attend grant writing workshops and conferences in a variety of disciplines so as to be abreast of the latest trends in education.

As grants director, she reported directly to the superintendent and in turn supervised two clerical workers.

In 1997, Johns came under public scrutiny after local newspapers published articles alleging that he had closed down a public school in order to enhance the business of a competing private school run by Johns's son, the Kentucky Youth Academy. Justice served as a director of the Kentucky Youth Academy and, at public meetings of the Board, she repeatedly defended Johns and the Academy. Nevertheless, in May 1998, Johns resigned as superintendent and Brenda Gooslin was appointed interim superintendent. After Johns's resignation, Justice published an article in the local paper further defending and praising him.

In August 1998, supporters of defendant Welch defeated Gooslin's supporters in school board elections and the Board appointed Welch as the new superintendent. In April 1999, Welch, claiming that the grants department was not an efficient use of resources, prevailed upon the Board to abolish it and return its functions to other administrators. Welch notified Justice that, starting in the 1999-2000 school year, she would be assigned back to classroom teaching duty. As classroom teacher, Justice would have continued to draw the same per diem salary. But because as a classroom teacher she was only expected to work 185 days a year, compared to the 240 days a year as a grants director, this would have involved a significant reduction in annual salary.

Justice had become significantly disabled since she last held a classroom teaching position. On November 11, 1995, about the same time she was promoted to grants director, she

suffered a serious car accident, resulting in multiple fractures, contusions, and whiplash. These injuries and the subsequent post-traumatic arthritis made it difficult for her to stand or walk for extended periods of time, climb stairs, or run. These disabilities did not substantially interfere with her work as a grants director, most of which was sedentary. According to Justice's medical experts, these disabilities would have made it very difficult for her to function as an effective classroom teacher, a position requiring frequent standing and walking. Justice also suffers from chronic depression and had been taking medication for this condition since 1985. Justice claims that her mental problems were triggered by a confrontation with a student and that they render her unable to handle classroom stress.

Justice complained about the reassignment to Welch, alleging that it constituted punishment for her political association with and support for Johns. She also claimed that she was unable to perform the duties of a classroom teacher because of her disabilities and that she had to be assigned to a non-classroom position. When Welch was unmoved by these complaints, Justice accepted the classroom assignment under protest and immediately applied for disability retirement under the Kentucky Teacher's Retirement System. To succeed in such an application, the claimant must demonstrate that she is unable to perform the essential functions of her job. On August 1, 1999, prior to her scheduled start of work as classroom teacher, Justice was granted disability retirement.

On October 29, 1999, Justice filed a complaint against the Board and Welch in the United States District Court for the Eastern District of Kentucky. In it she alleged that the defendants had deprived her of her First and Fourteenth Amendment rights to freedoms of expression, speech, and association, in violation of 42 U.S.C. § 1983, denied her a position in order to punish her for her political affiliation, in violation of Ky. Rev. Stat. § 161.164(4), and discriminated against her on the basis of her disabilities, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, and the Rehabilitation Act, 29 U.S.C. § 794. She also alleged parallel state constitutional claims, under Ky. Const. §§ 1 and 2, and state anti-discrimination claims. On these grounds, she asked for compensatory and punitive damages, injunctive relief, and attorney's fees. On August 17, 2001, the district court granted the defendants' motion for summary judgment. The district court concluded that the position of Grant Development Director was one for which consideration of political affiliation or support was appropriate, thus defeating Justice's federal constitutional claims, and that Justice, by applying for disability retirement, had conceded that she was not a qualified individual within the scope of the ADA and the Rehabilitation Act, thus defeating her disability discrimination claims. Having disposed of all of Justice's federal claims, the district court declined to exercise supplemental jurisdiction over her state law claims. The district court also did not rule on the defendants' proffered Eleventh Amendment and qualified immunity defenses. Before the court now is Justice's timely appeal of the district court's grant of summary judgment on the federal questions.

During the pendency of this appeal, we heard and decided two factually and legally closely-related cases. In *Hager v. Pike County Board of Education*, 286 F.3d 366 (6th Cir. 2002), we decided a case mirroring Justice's constitutional claims. Carolyn Sue Hager, too, was a teacher in the Pike County school system. *Id.* at 368. Hager had publicly supported Johns's appointment as superintendent and Johns had appointed Hager to the position of Gifted and Talented Teacher/Coordinator. *Ibid.* After Johns retired and Welch became superintended, he "decided to eliminate [Hager's] position and reassign the duties to another central office employee in an unpaid capacity." *Id.* at 369. "He believed this arrangement was a more economic and efficient use of district resources." *Ibid.* Hager was "reassigned to classroom

teaching at the elementary school level, with a salary reduction of $28,000 and no responsibilities in the" Gifted and Talented Program. *Ibid.* Two months before Justice filed her complaint, Hager filed a complaint against the same defendants, raising the same constitutional claims, in the same court, presided over by the same judge. The district court, as here, found that Hager's position was of a type that allowed her to be dismissed on the basis of political affiliation or support, and granted summary judgment to defendants. *Id.* at 368. We held that Hager's position was not of this type and therefore reversed and remanded for a finding as to whether Hager's political affiliation or support had been the cause in fact of her dismissal. *Ibid.*

In *Dotson v. Pike County Board of Education*, 2001 WL 1216998 (6th Cir. 2001) (per curiam) (table), we decided a case mirroring Justice's disability discrimination claims. Fannie Louise Dotson, too, had been a teacher in the Pike County school system. *Id.* at *1. In 1997, Dotson retired on income from the Board's early retirement plan. *Ibid.* She also drew disability benefits from the Kentucky Teacher's Retirement System based on knee and back injuries, until she was informed that teachers drawing disability benefits from that system where ineligible for the Board's early retirement plan. *Ibid.* In response, Dotson filed a complaint alleging disability discrimination, in violation of the ADA and the Rehabilitation Act, against the same defendants, in the same court, presided over by the same judge. *Ibid.* "The district court held that Dotson's receipt of disability benefits prevented her from claiming that she is a 'qualified individual with a disability' who could perform the essential functions of her job, as required by the ADA." *Ibid.* Because the standards for disability under the ADA and the retirement plan differ, we reversed. *Id.* at *2.

## II

We recently summarized the state of the law of politically motivated firings:

[The plaintiff] argues that her demotion and reassignment were in retaliation for the exercise of her constitutional rights to political expression and association. These rights are well-established under the Constitution. *See, e.g.*, *Rutan v. Republican Party*, 497 U.S. 62, 69 (1990) (quoting *Elrod v. Burns*, 427 U.S. 347, 356 (plurality opinion)) ("Political belief and association constitute the core of those activities protected by the First Amendment."). Moreover, "even practices that only potentially threaten political association are highly suspect." *McCloud v. Testa*, 97 F.3d 1536, 1552 (6th Cir. 1996) ("*McCloud I*").

The defendants argue that [the plaintiff] was in a position that allowed the defendants to consider political affiliation in their personnel decisions under the *Elrod/Branti* exceptions to the general prohibition against government employment decisions based on political activities. The district court agreed and found no violation of a constitutional right. "Whether political affiliation is an appropriate consideration for a government position is a question of law." *Sowards v. Loudon County*, 203 F.3d 426, 435 (6th Cir. 2000). Therefore, to obtain summary judgment, defendants must establish that no genuine issues of material fact exist as to "'whether political affiliation may appropriately be considered with respect to the position in question.'" *Id.* (quoting *Feeney v. Shipley*, 164 F.3d 311, 314 (6th Cir. 1999)).

It is well-settled that public employees enjoy First Amendment freedoms of political belief and association, however, if the exercise of those rights interferes with the discharge of public duties, then the rights may have to yield to the government's interest in maintaining

effectiveness and efficiency. *Elrod*, 427 U.S. at 366. "Limiting patronage dismissals to policymaking positions is sufficient to achieve the valid governmental objective of preventing holdover employees from undermining the ability of a new administration to implement its policies." *Id.* In contrast, "'[n]onpolicymaking individuals usually have only limited responsibilities and are therefore not in a position to thwart the goals of the in-party.'" *Hall v. Tollett*, 128 F.3d 418, 422 (6th Cir. 1997) (quoting *Elrod*, 427 U.S. at 367). Therefore, "the single substantive question . . . is whether a nonpolicymaking, nonconfidential government employee can be discharged or threatened with discharge from a job that [she] is satisfactorily performing upon the sole ground of [her] political beliefs." *Elrod*, 427 U.S. at 375 (Stewart, J., concurring). This question extends beyond the context of firings, to include areas such as transfers, promotions, and recalls from layoffs. *Rutan*, 497 U.S. at 64. Abolition of positions, reassignments, and/or demotions are also included. *See id.*; *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999) (en banc). Thus, to avoid a constitutional violation in instances of patronage, the hiring authority must "demonstrate that party affiliation is an *appropriate requirement* for the effective performance of the public office involved." *Branti v. Finkel*, 445 U.S. 507, 518 (1980) (emphasis added).

*Hager*, 286 F.3d at 371-72 (citations regularized).

To add concreteness to this exception to the First Amendment protection of public employees, we have established four broad categories of positions that fall within the *Elrod*/*Branti* exception. *McCloud I*, 97 F.3d at 1557. These categories are: (1) positions explicitly empowered by law to exercise political discretion; (2) positions not explicitly so empowered, but exercising political discretion by a jurisdiction's pattern or practice; (3) confidential advisors;

and (4) positions filled by balancing of affiliations. *Ibid.* While a government position "need not fall neatly within one of the categories" to fit into the exception, any position that falls into these categories "with reasonable certainty" removes its holder from the constitutional protection against political dismissal enjoyed by other employees. *Sowards*, 203 F.3d at 435-36. The court below held that Justice's position fell within category two and here the Board argues that Justice's position falls within categories one, two, and three. That her position is not within category four is undisputed. We consider the applicability of the first three categories seriatim and conclude that Justice's position of Grants Development Director does not fit within any of them.[1]

In *McCloud I*, we defined category one as "positions specifically named in relevant federal, state, county or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted." 97 F.3d at 1557. This category "captures the intuition gained from reading *Elrod*, *Branti*, and *Rutan* that a chief executive's cabinet secretaries and similar employees fall into the *Branti* exception. The proviso that the policymaking authority possessed by a category one position-holder must be held in relation to a matter of political concern stems from the discussion in *Branti* that a football coach is a policymaker, but not the sort of policymaker for whom political affiliation is an appropriate requirement under the First Amendment." *Id.* at 1557 n.30. As an illustrative examples of a position

---

[1]In so doing we look at Justice's actual duties. "To determine whether political affiliation is an appropriate requirement, a reviewing court 'must look beyond the mere job title and examine the *actual duties* of the specific position.'" *Hager*, 286 F.3d at 372 (quoting *Hall*, 128 F.3d at 423, emphasis in *Hager*). In the present case, the court below looked mainly at Justice's formal job description. However, as Justice's actual duties, according to her own testimony, match her job description well, this was at worst harmless error.

within this category we listed "a secretary of state given statutory authority over various state corporation law policies." *Id*. at 1557.

The Board argues that because it is authorized by law to establish written job descriptions, and Justice had such a description, her position falls within category one. This scarcely needs refuting. A written job description is not "federal, state, county or municipal law." Nothing in our precedents suggests it is and the Board cites no support for this proposition. Our category one case law focuses on whether positions established in law are political in nature. *See, e.g.*, *Hoard v. Sizemore*, 198 F.3d 205, 214 (6th Cir. 1999) (county road supervisor within category one because "state law specifically provides for [the position] which 'has the general charge of all county roads and bridges within his county' and must see that 'county roads and bridges are improved and maintained as provided by law' and '[r]oad maintenance is a policy of political concern'" and the road foreman "has some discretionary authority with respect to carrying out this policy."); *Collins v. Voinovich*, 150 F.3d 575, 578 (6th Cir. 1998) (executive director of Ohio Lottery Commission within category one because it is a cabinet-level position "charged with administering the [lottery] in accordance with the governor's mandate" and named in state law). However, we have never held that the requirement that a position be established in law could be fulfilled by a mere job description. Instead, we have created category two to cover positions similar to category one positions but not created by law.

In *McCloud I*, we defined category two as "positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions." 97 F.3d at 1557. This

category "is constructed to recognize that it may be necessary to deny First Amendment protection not just to positions at the very top of any state administrative hierarchy, but in some cases to those occupying levels a bit farther down the hierarchy. Category two also exists to capture those who would otherwise be category one policymakers, except that the federal government, state, county, or municipality has chosen for whatever reason not to set out the responsibilities of such a position in a statute, ordinance, or regulation." *Id*. at 1557 n.31. As an illustrative example of a position within this category we gave "a deputy secretary of labor in a state, to whom the secretary of labor has delegated the responsibility for crafting the department's annual proposed legislative agenda." *Id*. at 1557.

While the language in *McCloud I* suggests that category two could be limited to relatively high-level executive positions, our case law has made clear that the hallmark of a case two position is not high rank, but *political* discretion, even if exercised at a fairly low level. *Compare Hall*, 128 F.3d at 426 & n.4, 429 & n.6 (chief deputy sheriff, but not other deputy sheriff, within category two because sheriff had "delegated a significant portion of his or her discretionary responsibility" to chief deputy), *with Hager*, 286 F.3d at 377 (school's gifted and talented coordinator not within category two because she had no budgetary discretion), *Heggen v. Lee*, 284 F.3d 675, 684 (6th Cir. 2002) (deputy sheriff whose duties "comprised road patrol, serving arrest warrants and civil papers, taking complaints, 'working' auto accidents, and transporting prisoners" not within category two), *and Sowards*, 203 F.3d at 437 (chief jailer not within category two because she did "not participate in any type of policymaking"). At the same time, we have held that a defendant who dismisses on the basis of political affiliation "a governmental employee [who] may be nothing more than a supervisor with a glorified title who is simply performing functions over which he or she has no discretion, or no discretion of political significance," will not even meet the

highly deferential standard of the qualified immunity defense. *McCloud I*, 97 F.3d at 1559.

The Board argues that Justice falls within this category because she exercised some discretion about how to seek grants. Also the Board points out that Justice, even though she only had two subordinates herself, reported directly to the superintendent, a category one position, a factor that we had given some weight in *Hall*. It is true that Justice's relatively low-level position does not automatically exclude her from this category. It is also correct that Justice exercised some discretion in her position. However, every position but the most menial involves the exercise of a degree of discretion. What distinguishes category two positions from others is the exercise of discretion of *political significance*. Such discretion Justice did not have. The core of her duties as grants director was to raise as much money as possible and to ensure that the conditions attached to the money were complied with. The former is a goal that a superintendent of practically any political persuasion would seek to pursue and the latter a legal obligation that any superintendent would be bound to observe.[2] Therefore Justice, lacking political discretion, was not within category two.

In *McCloud I*, we defined category three as "confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on

---

[2]This is not to say that there will never be a political aspect to the quest for grant funds. A funding program could easily carry with it conditions which are politically highly sensitive; one need only think of a grant exclusively for the teaching of sex education or creationism. To decide to accept or reject such a grant is clearly a political question. However, nothing in the record suggests that any such politically sensitive grant came up during Justice's tenure or that it would have been within her authority to decide to accept such a conditional grant. To the contrary, Justice testified that she would ask the superintendent's express permission before applying for any grant.

how to exercise their statutory or delegated policymaking authority, or other confidential employees who control the lines of communication to category one positions, category two positions or confidential advisors." 97 F.3d at 1557. This category "is formulated to comport with the discussion in *Branti* indicating that a state governor may 'believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments.'" *Id.* at 1557 n.32 (citing *Branti*, 445 U.S. at 518). As an illustrative example of a position within this category we gave "a judge's law clerk or secretary." *McCloud I*, 97 F.3d at 1557.

The contours of category three have been further clarified in our case law. *Compare Hoard*, 198 F.3d at 213-14, 215 (county road supervisor within category three because he "serve[d] as the judge's 'alter-ego' in the community with respect to road conditions"), *id.* at 215-16 (assistant road foreman, garage supervisor, and senior citizens director within category three for similar reasons), *Collins*, 150 F.3d at 578 (executive director of Ohio Lottery Commission within category three because that office is charged with "communicat[ing] departmental views to the press or the legislature"), *Hall*, 128 F.3d at 426 & n.4, 429 & n.6 (chief deputy sheriff, but not other deputy sheriff, within category three because chief deputy at times acted as "confidential advisor to the sheriff"), *and Smith v. Sushka*, 117 F.3d 965, 971 (6th Cir. 1997) (administrative assistant to county chief engineer within category three because she was a "confidential employee[ ] who control[led] the lines of communications to [a] category one position"), *with Hager*, 286 F.3d at 374-76 (school's gifted and talented coordinator not within category three because she did not deal with political issues, advise the superintendent on confidential information, or control the lines of communication to the superintendent), *Sowards*, 203 F.3d at 437 (chief jailer not

within category three because she did not "not have any access to any confidential or political information"), *and Bauer v. Montgomery*, 215 F.3d 656, 660-61 (6th Cir. 2000) (field investigator in attorney general's office not within category three where there was no evidence that plaintiff provided confidential advice or controlled the lines of communication to anyone).

Justice did not spend a considerable portion of her time rendering confidential advice to the superintendent. The eight-point job description on which the Board and court below rely so heavily does not even mention the rendering of advice to the superintendent. While Justice did report to the superintendent, and every subordinate will at times communicate with a superior in a manner that can fairly be described as giving advice, nothing in the record indicates that Justice would spend more of her time giving advice than any other subordinate in a hierarchical organization. Moreover, while presumably some of the communications between Justice and the superintendent were not meant for public consumption, there is nothing in Justice's duties that renders her advice particularly sensitive or confidential.

Nor did Justice control the lines of communication between the superintendent and the general public. While communications between the superintendent and Justice's two staff persons or grantors would usually have passed through Justice, not everyone who sometimes passes messages from political appointees is therefore in control of the lines of communication. To hold otherwise would put every public employee working under a political appointee in category three. Rather, the lines-of-communication subset of category three focuses on those who control the lines of communication *with the general public and its representatives. See McCloud I*, 97 F.3d at 1557 n.32 (referring to those who "write speeches, explain . . . views to the press, or communicate with the legislature" on behalf of a political superior). Control over such lines of

communication, even at a fairly low and non-policy making level, will suffice to remove a position from the protection against political dismissals. *See Faughender v. City of North Olmsted*, 927 F.2d 909, 911, 913-14 (6th Cir. 1991) (allowing political refusal to rehire mayor's secretary who answered the phone used by the members of the public wishing to contact the mayor). However, Justice's position did not control these lines of communication, even at a low level. Therefore, Justice's position does not fall within category three.

In *Hager*, we also found Kentucky state law probative of the question whether Hager's position was protected from dismissal on the basis of her political affiliation or support:

In addition to the *Elrod/Branti* exceptions, there is an additional factor that the district court did not adequately consider in its determination that politics was an appropriate requirement for the [Gifted and Talented Program Coordinator] position. Kentucky statutory law clearly establishes that a teacher or employee of a school district has the right to be free from demotion or discrimination based on political affiliation. KRS § 161.164(4) ("[n]o teacher or employee of any district board of education shall be . . . demoted or dismissed from, any position or in any way . . . discriminated against with respect to employment because of [her] political . . . affiliations."); *see also Sowards*, 203 F.3d at 439 n.4 ("it is important to examine the applicable state and local law when deciding whether political considerations may be used in employment decisions . . . ."). The existence of the Kentucky statute as protection against political reprisal such as occurred in this case has been clearly established by the Kentucky courts for many years. *See Calhoun v. Cassady*, 534 S.W.2d 806, 808 (Ky. 1976) (statute enacted to prevent Superintendent and Board from perpetrating transfers and demotions as political "vendettas" for supporting candidates opposed to Superintendent in race for office);

*see also Harlan County Bd. of Educ. v. Stagnolia*, 555 S.W.2d 828, 830 (Ky. Ct. App. 1977) ("Political reprisals by superintendents and a majority of board members brought about the enactment of KRS 161.162 which prohibits such action."). The existence of this long-standing prohibition raises significant question as to the legitimacy of the defendants's actions in this matter.

*Hager*, 286 F.3d at 377. As the relevant Kentucky state law does not distinguish between the positions of Gifted and Talented Program Coordinator and Grants Department Director, identical considerations apply here.

### III

In *Dotson*, we answered in the negative the question of whether receipt of a Kentucky Teacher's Retirement System disability pension estops the recipient from arguing that she was a "qualified individual with a disability." While *Dotson* was a non-precedential opinion, its reasoning, based on both recent Supreme Court precedent and recent, binding precedent of this court, is sound and applicable here:

> The ADA prohibits discrimination against any "qualified individual with a disability," which is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §§ 12112(a), 12111(8). However, in order to qualify for disability retirement, Dotson had to attest that she "suffer[s] from a physical or mental condition presumed to be permanent in duration and of a nature as to render the member incapable of being gainfully employed . . ." Ky. Rev. Stat. Ann. § 161.661(9) (1996). The district court held that the conflict between Kentucky's disability retirement statute and the ADA necessarily prevented Dotson from having standing under the ADA.

> In *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805, 119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999), the Court held that despite the conflict between the social security program, which provides benefits to a person with a disability that cannot perform his work, and the ADA, which requires a person to be able to perform the essential functions of his job, receipt of social security benefits does not automatically estop a recipient from pursuing an ADA claim. The Court concluded that the two claims do not inherently conflict because the Social Security Act does not account for the possibility of work with "reasonable accommodation," whereas the ADA does. *See id.* at 802-03. Similarly, although the ADA and the Kentucky statute appear to conflict, Dotson's qualification for disability retirement did not automatically estop her from pursuing an ADA claim.
>
> To survive summary judgment, Dotson must provide an explanation sufficient to warrant a reasonable juror finding that, despite her statement that she is unable to work, that she could nonetheless perform the essential functions of her job, with or without reasonable accommodation. *See Cleveland*, 526 U.S. at 807; *see also* [*Griffith v. Wal-Mart Stores, Inc.*, 135 F.3d 376, 383 (6th Cir. 1998)].
>
> Dotson provided evidence that she had been able to teach effectively throughout the 1996-97 school year, and although she submitted a request for accommodation to which the school did not respond, she continued to work. Thus, a genuine issue exists as to whether Dotson was a "qualified individual with a disability" under the ADA. In addition, the court never addressed directly the question of whether Dotson was in fact disabled under the ADA. It was error to grant summary judgment on the ADA and Rehabilitation Act claims.

*Dotson*, at *1-2 (footnotes omitted). For this reason, Justice too was not estopped from making her ADA claim by receipt of her disability pension.

The Board attempts to distinguish *Cleveland* on the basis that social security disability income depends on a finding that an applicant cannot find employment in the economy in general, while the teacher's disability pension depends on a finding that the applicant can not perform the job of a teacher. In *Dotson*, which the Board urges us to disregard as non-precedential, we rightly noted that this was not a relevant distinction. Rather, the holding of *Cleveland* (and *Dotson*) depended on the realization that inability to perform a job *without accommodiation* and ability to perform a job *with accommodation* are not mutually exclusive. Nothing in the Board's argument addresses this issue. Equally unavailing is the Board's argument that Kentucky state law bars disabled teachers from working in the school system. In so far as state law conflicts with valid federal law, federal law prevails. U.S. Const. art. VI, cl. 2.

## IV

As we hold that Justice's claims were not precluded by the alleged political nature of her position and her request for a disability pension, respectively, we **REVERSE** the district court's summary judgment and **REMAND** for further proceedings not inconsistent with this opinion.